GEORGE A. HAYDEN, TRUSTEE IN INSOLVENCY, vs. NOYES
B. ALLYN AND OTHERS.

Hartford Dist., Jan. T., 1887. PARK, C. J., CARPENTER, PARDEE,
LOOMIS and GRANGER, Js.

A payment or delivery of goods by a failing debtor to a creditor must have
been made " with a view to insolvency," to bring it within the invali-
dating provisions of the insolvent act. (Gen. Statutes, p. 378, sec. 1.)

It is not enough that the debtor should have been actually insolvent. The
insolvency intended by the act is legal insolvency, or insolvency estab-
lished by legal proceedings.

But the mere fact that the debtor did not intend to go into insolvency is
not enough to save the transaction. He may not have intended to
make an assignment, and yet have known that his creditors would
carry him into insolvency.

The case comes within the statute if the debtor knew that he could not
escape insolvency and was acting in expectation of it.

But where the act is done by the debtor in the expectation of being able
to extricate himself from his embarrassments, and go on with his busi-
ness, and as a means of accomplishing that result, the law does not
regard it as done with a view to insolvency.

The facts were found by the court in detail with regard to a transaction
between a debtor and creditor, and the court "upon the facts set
forth" held the transaction void under the insolvent act. Held that
the conclusion of the court was one of law and not of fact, and that it
could be reviewed by this court.

[Argued January 14th—decided February 25th, 1887.]

ACTION to recover the value of goods claimed to have
been transferred to the defendants in violation of the insol-
vent act; brought to the Court of Common Pleas of Hart-
ford County. The plaintiff was the trustee in insolvency of
the estate of one Frederick A. Wheeler, and the goods in
question had been transferred and delivered by Wheeler to
the defendants, who were his creditors, shortly before he
was carried into insolvency. The case was tried to the
court before *Bennett, J.*, who made the following finding of
facts.

The defendants are partners under the name of the Allyn
& Blanchard Company, dealing in groceries in the city of

Hartford. The partnership consists of N. B. Allyn, O. H. Blanchard, C. G. Lincoln, and R. N. Seyms.

Between November 20th, 1885, and February 10th, 1886, they had sold and delivered goods to the value of $382.31 to Frederick A. Wheeler of Hartford, a retail dealer in groceries and meat, and on March 11th, 1886, he was owing them $232.04.

Wheeler's place of business consisted of two stores adjoining and connected by an arch through the partition wall; in one he conducted the grocery business, in the other the meat business. He had one clerk.

Charles A. Fowler was employed by the defendants as their city agent in soliciting orders for goods and collecting accounts due the firm. The first bill of goods sold Wheeler November 20th, 1885, amounted to $223.89, a part of which was sold on thirty days time and a part on sixty days. On that day Wheeler was put on Fowler's list of customers, and thereafter Fowler continued to visit him regularly twice a week in common with all other customers on his list. After the account became due Fowler began to dun Wheeler, and continued to do so upon his regular visits as often as once or twice a week until March 1st, 1886.

During that time Wheeler made two payments—January 1st, $100, and March 1st, $50. From November 20th, 1885, to February 10th, 1886, Fowler continued to sell goods to Wheeler to any amount he chose to order, and upon the regular credit given by the defendants to their customers.

On February 1st Wheeler took an inventory of his business, which showed $750 of assets and $500 debts.

About the middle of February Wheeler made a statement of his assets and liabilities to Fowler as shown by the inventory, and at the same time represented to him that a friend in Springfield either owed him, or was about to lend him, sufficient money to pay all his debts. Fowler reported these statements to the defendants the same day.

In the latter part of February Wheeler had a further talk with Fowler about his business affairs, and then said that his meat business was profitable, but that his grocery busi-

ness was not; that he contemplated a change in his business arrangements, and wanted either to obtain a partner or sell out his grocery department; that he would buy no more goods of the Allyn & Blanchard Company until he had paid their bill in full, and asked Fowler if his firm would take back the goods on hand which he had bought of them. Fowler told Wheeler that he had no authority to take the goods back, but advised him to consult the defendants.

On March 1st Wheeler went to the defendants' store and paid them $50 on account, and at the same time had a talk of an hour or more about his business affairs with Allyn, one of the defendants. He stated that he did not have the money to pay his debts then due, and could not turn his goods fast enough to meet his obligations; that all his creditors were asking for payment, but the defendants were pressing him the most; that the defendants were his largest creditor, and the only one that he owed more than $100. Wheeler asked the defendants to take back his stock of groceries on hand which he had bought of them, and credit the amount on his account, stating that if they would do so he could close out his grocery business, thereby reducing his expenses by surrendering the lease of one store and discharging his clerk. He thought in that way he could go on with his meat business. Allyn suggested that instead of returning the goods he should try and borrow $400, or get a partner, or sell out his grocery business, but that if he did not succeed in any of those efforts they then would take back the goods. Wheeler went away to make an effort to carry out Allyn's suggestion.

March 11th Wheeler telephoned to the Allyn & Blanchard Company that he wished them to take back the goods that day. Allyn received the message and asked him to come to the store. Allyn was about leaving for New York and spoke to Blanchard about the matter, stating that Wheeler would come to the store for the purpose of returning the goods and fixing up his account. About two o'clock Wheeler came and saw Blanchard, and stated that he wished to fix up his account by returning the goods. Blanchard did

Hayden v. Allyn.

not wish to take back the goods, and suggested that he sell them to some one and pay them the proceeds. Wheeler stated that he had tried to sell them, but could not find a customer, and as he had no money he did not know how they could get payment unless they took back the goods. He thought if he could fix up their account he could go on in business, as his other creditors were not pressing him. Seyms was also present at this time, and suggested to Wheeler that he thought Woodward & Co. would buy the goods. Seyms and Wheeler then went to the store of Woodward & Co. to find Woodward. Woodward & Co. were successors to Seyms & Co., retail grocers, and also were customers of the Allyn & Blanchard Co. to the extent of about $500 per month.

Seyms stated to Woodward that he wanted him to buy the stock of groceries belonging to Wheeler. When Woodward wished to know why he wanted him to buy, Seyms said, " You go down and buy them, it is all right," meaning by that that if Woodward bought the goods and lost anything by reason of so doing he would make his loss good. Woodward agreed to buy the goods at the price at which they had been billed to Wheeler by the Allyn & Blanchard Co. He bought them simply on the suggestion of Seyms, but expected to use them in his business. Seyms, Wheeler and Woodward went at once to Wheeler's store, and the goods were then delivered to Woodward. The whole amount of goods delivered was $184.26. It was agreed between Seyms and Wheeler that the proceeds should be turned over to the Allyn & Blanchard Co. and credited on their account with Wheeler. There were two loads of the goods. The first load was taken to the store of Woodward & Co. After the second load was on the wagon Woodward told Seyms that he could not take the goods, because he thought if it should become known to his customers that he had bought a second-hand stock and put in with his own stock, it would injure his trade.

Woodward decided not to take them, and then Seyms ordered the second load then on the wagon to be taken to

the store of the Allyn & Blanchard Co., and it was so delivered. On the next day the other load was also delivered at the store of the company, and all the goods became a part of their stock. In the evening of March 11th Seyms and Wheeler met at Woodward's store to close up the transaction. Woodward gave Woodward & Co.'s check for $184.26 to Wheeler, payable to his order, which Wheeler indorsed and delivered to Seyms. Seyms gave Seyms & Co.'s check for $184.26 to Woodward, payable to Woodward & Co.'s order. The next day Seyms turned over Woodward & Co.'s check indorsed by Wheeler to the Allyn & Blanchard Co., and the amount of $184.26 was credited on their account with Wheeler. Then the Allyn & Blanchard Co. gave their check for $184.26 to Seyms, payable to his order, and in a day or two afterwards the Allyn & Blanchard Co. cashed their check for Seyms, who put the amount to the credit of Seyms & Co., and that completed the transaction.

Wheeler continued his business for a few days afterwards, when his store was attached by a creditor and closed up. March 18th a creditor's petition was filed in the probate court praying that Wheeler be adjudged an insolvent, and on March 25th he was so adjudged. The plaintiff, George A. Hayden, was appointed his trustee in insolvency and has duly qualified. The whole estate of Wheeler, as inventoried and returned by the trustee, is $138.40.

The plaintiff made demand before the bringing of this action upon the Allyn & Blanchard Co. for the goods taken from Wheeler's store, which was refused. The value of these goods is found to be $184.26.

March 11th, 1886, Wheeler was in failing circumstances. He was owing debts upwards of $500, and was unable to pay them in the ordinary course of business. His creditors, some of them, were pressing for payment. His business affairs were in so critical a condition that an attachment put on his store closed it up, and was followed at once by proceedings in insolvency.

At the time the transfer of goods was made the Allyn &

Blanchard Co. knew of Wheeler's inability to pay his debts in the ordinary course of business, and that such transfer of goods was the only way he could meet his debt to them. They also knew that Wheeler's hope of being able to go on in his business after such adjustment of their claim rested on the fact that his other creditors were not pressing him for payment. At the time of the transfer of the goods Wheeler did not intend to go into insolvency.

Upon the facts set forth it is found that the transfer of goods was not made in good faith in the regular course of business, and was made in view of insolvency, and with intent to prefer a creditor, the Allyn & Blanchard Co., and with the knowledge of such creditor that it was so made, within the meaning of the insolvency act of 1885.

The court rendered judgment for the plaintiff, for the value of the goods, and the defendants appealed to this court.

*L. Sperry*, for the appellants.

1. The conclusion of the court below upon the facts is clearly a conclusion of law, and as such it can be reviewed by this court. This is clearly shown by the language used—" upon these facts I find, etc." The evidence had exhausted itself in establishing the facts found in detail, and it was wholly upon those facts, and not upon that evidence, that the judge made his conclusion that Wheeler made the transfer in view of insolvency and with intent to prefer the defendants over his other creditors.

2. The court erred in concluding, from the facts found, that the transfer was made by Wheeler " in view of insolvency." It is expressly found that at the time of the transfer he " did not intend to go into insolvency." It appears by the finding that his object in making the transfer was to dispose of his largest and most urgent creditor, reduce his expenses and continue in business. That he could very reasonably have expected to continue in business appears at length in the finding. His inventory taken a short time before " showed $750 of assets and $500 in debts." He was

unable to pay cash because he " could not turn his goods fast enough to meet his obligations." " The defendants were his largest creditors, and the only one that he owed more than $100. Wheeler asked the defendants to take back his stock of groceries on hand which he had bought of them and credit the amount on his account, stating that if they would do so he could close out his grocery business, thereby reducing his expenses by surrendering the lease of one store and discharging his clerk. He thought in that way he could go on with his meat business." And on the day of the trans· fer " Wheeler stated that he had tried to sell them but could not find a customer, and as he had no money he did not know how they could get payment unless they took back the goods. He thought if he could fix up their account he could go on in business as his other creditors were not pressing him." Whether Wheeler was in fact insolvent at the time is not important. The record shows that he expected to continue in business, and his good intentions are evidenced by the finding that he actually continued in business thereafter until forced into insolvency by involuntary proceedings. This court has repeatedly passed upon cases of similar character, and has upheld transfers and payments made in such circumstances. *Utley* v. *Smith*, 24 Conn., 290; *Crosswell* v. *Allis*, 25 id., 301; *Quinebaug Bank* v. *Brewster*, 30 id., 559; *Bloodgood* v. *Beecher*, 35 id., 469; *Hall* v. *Gaylor*, 37 id., 550. In *Utley* v. *Smith*, the court say : " Three things are necessary to make the deed of an insolvent debtor fraudulent and void under the statute of 1853. First, the grantor must be in failing circumstances ; second, the deed must be made with a view to insolvency ; and third, the deed must be made with an intent to prefer one creditor to another." The case of *Bloodgood* v. *Beecher* is the leading one on the subject in our reports and is directly applicable to the present case. In that case the court says (p. 482) : " The finding says that Beecher did not make the mortgage with the intention of stopping his payments or closing his business. He then did not make it with a view to insolvency. This alone would seem to be conclusive

of the case. * * * The finding on this subject is as follows:
'Said mortgage was made by him knowing that he was then
insolvent, not with the intention of stopping payment or
closing his business, but to prevent interruption, and to
avoid a suit and an assignment for the benefit of his credit-
ors, in the hope on his part that by making large profits and
by some turn of good fortune he should be extricated from
his embarrassment.' There is no finding here that the
mortgage was made with a view to insolvency, as the cases
cited require, and how can this court find the fact? There
is no evidence even, tending to show the fact, except that
Beecher knew he was then insolvent. But it is obvious
that insolvency known to a party is not enough, as matter
of law, to bring a case within the purview of the statute,
for insolvency is there qualified by the phrases, 'failing cir-
cumstances' and 'with a view to insolvency' and having
'an intent to prefer one creditor to another.' These terms
are important, and show clearly what class of conveyances
made by an insolvent were intended to be reached by the
statute." To the same effect see the remarks of SANFORD,
J., in *Hall* v. *Gaylor*, before referred to.

*J. S. Barbour*, for the appellee.

1. The question whether the transfer of goods by Wheeler
to the defendants was made in failing circumstances, in view
of insolvency, and with intent to prefer the defendants over
other creditors, is wholly a question of fact. This court has
repeatedly so held. *Utley* v. *Smith*, 24 Conn., 312; *Hamil-
ton* v. *Staples*, 34 id., 316; *Bloodgood* v. *Beecher*, 35 id., 482;
*Hall* v. *Gaylor*, 37 id., 551.

2. Upon this question of fact the court below, after hear-
ing all the evidence, observing the conduct and demeanor of
the witnesses, and having the entire transaction laid bare,
has explicitly found that at the time of the transfer
"Wheeler was in failing circumstances," and that "said
transfer was not made in good faith in the regular course of
business, but was made in view of insolvency and with in-

tent to prefer the defendant creditor, and with the knowledge of such creditor that it was so made."

3. Such a finding of fact this court cannot review. *Nor. & Wor. R. R. Co.* v. *Kay,* 22 Conn., 607; *Utley* v. *Smith,* 24 id., 290; *Goodman* v. *Jones,* 26 id., 267; *Sisson* v. *Roath,* 30 id., 15; *Robertson* v. *Todd,* 31 id., 555; *Hamilton* v. *Staples,* 34 id., 316; *Bloodgood* v. *Beecher,* 35 id., 469; *Brady* v. *Barnes,* 42 id., 512; *Thomas* v. *Mullain,* 44 id., 144.

4. But if this court should decide in this case to review the conclusions of fact of the court below, then we submit that those conclusions are amply warranted by the "substantive facts" set forth in the finding. It is true that it is found that at the time of the transfer Wheeler did not *intend* to go into insolvency. But this court will notice that it is not found that he did not *expect* to. A man standing on thin ice, hearing it cracking and feeling it sinking under his feet, may not intend to get into the water if he can help it, but he is in tolerably plain view of it. If this carefully worded expression of the finding is to save the defendants, an involuntary insolvent may transfer every item of his assets to a creditor up to the very hour when he is, against his desires, adjudged bankrupt, and the creditor finds safe refuge behind the insolvent's declaration that he "didn't intend to go in." But on the other hand the facts and circumstances set forth stamp the transfer as an illegal and void conveyance. The juggling performance with the checks detailed in the finding, is redolent with the odor of knowledge of insolvency and intended preference. Wheeler's utter inability to pay his debts was known by the defendants, who knew also that this transfer of goods was the only way he could pay them, and they knew too that even after their debt was paid, his only hope of being able to continue business would be shattered if any one else asked him to pay. It is quite probable that bankruptcy never would be known in this weary world, if creditors would only refrain from presenting their bills. But in this case, in accordance with a prevalent custom, they did present them, and the crash came at once. Preference, attachment, aban-

donment of business, and insolvency "trod upon each other's heels, so fast they followed." And the trustee found the whole remaining estate of the insolvent to be less than the portion transferred to the defendants.

LOOMIS, J. This case turns upon the question whether the transfer of goods by Wheeler, the insolvent debtor, to the defendants was made in such circumstances that it was void as against Wheeler's creditors. The court below has found the facts in detail with regard to the whole transaction, and upon the facts so found held the transfer to be void under the insolvent law. The conclusion of the court upon the subject is thus stated in the finding :—" Upon the facts set forth it is found that said transfer was not made in good faith in the regular course of business, and was made in view of insolvency, and with intent to prefer a creditor, the defendant company." Upon this conclusion the court held the transfer void and rendered judgment for the plaintiff, the trustee in insolvency, to recover the value of the property.

If this had been a conclusion of fact from the evidence before the court it could not be reviewed; but it is very clearly an inference of law from the facts specifically found. The evidence had exhausted itself in producing the facts thus found. Nothing remained but for the court in the exercise of its legal judgment to draw its inference from the facts. This the judge himself distinctly states in saying that this conclusion is " upon the facts set forth."

In such a case the conclusion of the court can always be reviewed by the appellate court. An erroneous conclusion is an error of law and not an error in an inference of fact.

The question therefore is—whether the facts presented show clearly that the transfer was in violation of the provisions of the insolvent law and therefore void as against creditors. Clearly the burden of proof on this point rests upon the plaintiff. Aside from the ordinary rule that a plaintiff must make out his case, there is a presumption that a transaction is legal unless brought clearly within some prohibitory or invalidating statute or rule of law. At com-

mon law such a transfer would be valid, and it is rendered invalid if at all only by the provisions of our insolvent law. (Gen. Statutes, p. 378, sec. 1).

The provisions of that section are clearly and authoritatively summarized in *Utley* v. *Smith*, 24 Conn., 290, where the court says:—" Three things are necessary to make the deed of an insolvent debtor fraudulent and void under the statute of 1853. First, the grantor must be in failing circumstances; second, the deed must be made with a view to insolvency; and third, the deed must be made with an intent to prefer one creditor over another."

In this case the facts show that the debtor was in fact in failing circumstances, and, if what he did was in view of insolvency, the transfer of this property must be regarded as having been made to give the defendants a preference over his other creditors. The whole question therefore is whether the transfer was made " with a view to insolvency."

Upon this point it is not enough that a debtor was actually insolvent and that he knew that he was so. This is consistent with the intention and hope on his part to work out of his embarrassment and continue his business. In this case it is expressly found that the debtor "at the time of the transfer of the goods did not intend to go into insolvency." It is also found that at the time of the negotiation resulting in the transfer of the goods, " Wheeler asked the defendants to take back the stock of groceries which he had bought of them, stating that if they would do so he could close out his grocery business, thereby reducing his expenses by surrendering the lease of one store and discharging his clerk; and that he thought that in that way he could go on with his meat business." And on the day when the transfer was made it is found that Wheeler stated to the defendants "that he thought if he could fix up their account he could go on in business, as his other creditors were not pressing him." It is also to be noticed that this was not a payment to a particular creditor out of money representing goods which he had sold, which goods had been purchased of his various creditors, but was simply a return to the defendants

of goods which he had bought of them and which he had found himself unable to retain and pay for. This last fact is not of itself decisive and perhaps not very important, but it tends to show that the debtor's object was not to rob his other creditors for the sake of paying the defendants.

We think the mere fact that the debtor "did not intend to go into insolvency" is not of itself decisive of the matter. He might have seen that insolvency was inevitable, but have intended to wait for his creditors to move against him. It is enough if he knew that he could not escape insolvency and was acting in its presence and in expectation of it. But we think that it appears from the finding that he entertained a hope of so arranging his business after the return of the groceries to the defendants as to go on with his meat market, and that his object in making the transfer was rather to escape insolvency than to go into or be overtaken by it. When we consider that it must affirmatively appear that the defendant acted "with a view to insolvency," it is clear that the finding does not warrant the conclusion that the transfer was void under the statute.

The term "insolvency" as used in the statute, of course means insolvency in its technical sense, that is, proceedings in insolvency. It is very clear that a debtor may be in actual insolvency, that is, his assets may not be sufficient to pay his debts, and yet he may be very far from legal insolvency or serious danger of it.

The facts found in the case with regard to the exchange of checks between Seyms & Co., Woodward & Co., and the defendants, are in themselves suspicious and seem to indicate an impression on the part of all parties that the transaction might not bear the light; but we cannot, looking at the matter as a question of law, consider this sufficient to neutralize the other facts found to which we have alluded, while it would not be sufficient for them merely to neutralize those facts; they must predominate and determine the character of the transaction.

The view of the matter which we have taken is sustained by repeated decisions of this court giving construction to the

section of the insolvent law in question. *Utley* v. *Smith*, 24 Conn., 290; *Quinebaug Bank* v. *Brewster*, 30 id., 559; *Bloodgood* v. *Beecher*, 35 id., 469; *Hall* v. *Gaylor*, 37 id., 550.

There is error in the judgment appealed from, and a new trial is granted.

In this opinion the other judges concurred; except CAR-PENTER, J., who dissented.