**WABASH VALLEY POWER ASSOCIATION, INC., an Indiana not-for-profit corporation, Plaintiff–Appellee,**

v.

**RURAL ELECTRIFICATION ADMINISTRATION, Defendant–Appellant.**

No. 91–3673.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1992.

Decided March 16, 1993.

James T. Malysiak, Lee A. Freeman, Jr. (argued), John F. Kinney, Freeman, Freeman & Salzman, Chicago, IL; Warren D. Krebs, Larry J. Wallace, Don F. Morton, Parr, Richey, Obremskey & Morton; and James P. Moloy, and David Kleiman, Dann, Pecar, Newman, Talesnick & Kleiman, Indianapolis, IN, for plaintiff-appellee.

Gerald A. Coraz, Jeffrey L. Hunter, Asst. U.S. Attys., Office of the U.S. Atty., Indianapolis, IN; Peter P. Maier, Robert S. Greenspan, Dept. of Justice, Civ. Div., Appellate Section; N. Beth Emery, William D. DeGrandis, Paul, Hastings, Janofsky & Walker; Frank Clover, Michael W. Kelly, Gen. Counsel, Dept. of Agriculture, Office of the Gen. Counsel; and Thomas M. Bondy (argued), Dept. of Justice, Civ. Div., Appellate Section, Washington, DC, for defendant-appellant.

Wallace F. Tillman, Jonathan H. Glazier; N. Beth Emery, Bruce Ryan, and Mary T. Boyle, Paul, Hastings, Janofsky & Walker, Washington, DC; Frank J. Kelley, Atty. Gen., Don L. Keskey, Asst. Atty. Gen., Patricia S. Barone, Gay S. Hardy, Office of the Atty. Gen., State of Mich., Lansing, MI; James L. Turner, Robert K. Johnson, Robert M. Glennon, Office of Utility Consumer Counselor, Indianapolis, IN; William P. Rodgers, Jr. and Charles D. Gray, Nat. Ass'n of Regulatory Utility Com'rs, Washington, DC, for amici curiae.

Before FLAUM and RIPPLE, Circuit Judges, and SHADUR, Senior District Judge.[*]

FLAUM, Circuit Judge.

The history of this appeal from a grant of summary judgment against the Rural Electrification Administration ("REA") is long and unhappy. In 1978 the REA approved $360 million in loan guarantees to the power supply cooperative Wabash Valley Power Association ("Wabash Valley") to invest in a 17–percent share of the Marble Hill nuclear power facility. The Public Service Company of Indiana owned the other 83–percent share. Subsequently, the REA committed to additional guarantees of $588 million to Wabash Valley's Marble Hill venture, for a total of $948 million in loan guarantees. To collateralize these guarantees, the REA required Wabash Valley to enter into forty-year all requirements contracts (officially labelled wholesale power contracts) with each of its distribution cooperative members. According to the terms of these contracts, the REA agreed to be bound as third-party beneficiaries to rates "subject to the approval of the Public Service Commission of Indiana."

Because of sizable cost overruns, the Public Service Company canceled the Marble Hill nuclear power facility in January of 1984. That April, Wabash Valley requested a rate increase from the Indiana Utility Regulatory Commission ("IURC")[1] in order to repay loan monies expended on Marble Hill that the REA had guaranteed. Prior to any resolution of the rate increase by the IURC, Wabash Valley defaulted on its REA loans and filed for reorganization under Chapter 11; and the REA was left holding the multi-million-dollar bag. At the time of filing, Wabash Valley had outstanding debts to the REA totalling $671 million. Subsequently, Wabash Valley's petition to the IURC for a rate hike to cover its obligations to the REA was denied. Relying on its decision in *Citizens Action Coalition v. Northern Indiana Public Service Co.*, 485 N.E.2d 610 (Ind.1985), *cert. de-*

*nied*, 476 U.S. 1137, 106 S.Ct. 2239, 90 L.Ed.2d 687 (1986), the Indiana Supreme Court reiterated that the "used or useful" rule applies to customer-owned utilities and upheld the IURC's denial of Wabash Valley's request for a rate hike. *National Rural Utilities Cooperative Finance Corp. v. Public Service Commission of Indiana*, 528 N.E.2d 95 (Ind.App.1988), *aff'd*, 552 N.E.2d 23 (Ind.1990).

Having failed to recoup in state court the monies extended to Wabash Valley, the REA asserted jurisdiction over ratemaking by means of a preemption letter to Wabash Valley and the IURC. The REA's letter instructed Wabash Valley to raise its rates immediately and detailed a rate schedule. We found the REA's preemption letter to be invalid because it did not comply with the notice and comment requirements of the Administrative Procedure Act. *Wabash Valley Power Association v. Rural Electrification Administration*, 903 F.2d 445 (7th Cir.1990) ("*Wabash I*"). At the federal court level, the REA also raised the possibility of implied preemption for the first time. We held that principles of preclusion prevented the REA from asserting an implied preemption argument at that late stage of the litigation. *Id.* at 455.

While that case was still pending before this court, the REA published a notice of proposed rulemaking. 55 Fed.Reg. 12194–12202 (April 2, 1990). After the notice and comment period, the REA promulgated two new preemption regulations. 55 Fed.Reg. 38638–38654 (September 19, 1990). The first rule, concerning preemption for inadequate rates, reads in pertinent part:

(a) State regulatory authority jurisdiction over a power supply borrower's rates shall be preempted by the RE Act if the Administrator shall have determined that the borrower's rates approved by the state regulatory authority are, after taking into account the borrower's costs and expenses, inadequate to produce revenues sufficient to permit the borrower to make required payments on its secured loans and the borrower has

---

[*] The Honorable Milton I. Shadur, of the Northern District of Illinois, is sitting by designation.

1. The Indiana Utility Regulatory Commission was formerly the Public Service Commission of Indiana.

failed to make required payments on its secured loans.

7 C.F.R. § 1717.305 (1991). The second rule, concerning borrowers in bankruptcy, provides:

State Regulatory Authority jurisdiction over an REA borrower's rates shall be pre-empted by the RE Act and REA shall have exclusive jurisdiction over the borrower's rates:

(a) On October 19, 1990, with respect to any borrower by or against whom a case under the Bankruptcy Code of 1978, as amended, was commenced prior to and remains outstanding on October 19, 1990; and

(b) With respect to all other borrowers, upon the filing of a petition by or against the borrower commencing a case under the Bankruptcy Code of 1978, as amended.

7 C.F.R. § 1717.354 (1991). Stripped of their semantic trappings, both the preemption regulations and the bankruptcy regulations are rules designed to shift the risk of default on REA loans from the REA to cooperative members. After the REA promulgated these rules, Wabash Valley brought suit in federal court for a declaratory judgment to prevent their enforcement. The district court held the rules to be invalid. We affirm.

## I.

As a federal credit program, the REA promotes and facilitates investment in electricity (and telephones, to a lesser extent) for rural areas in order to ensure that these regions receive power at reasonable prices. *See* Congressional Budget Office, *New Approaches to the Budgetary Treatment of Federal Credit Assistance* (1984);

M. Weidenbaum & R. Harnish, *Government Credit Subsidies for Energy Development* (1976). It has traditionally performed this function by reducing the cost of funding to cooperatives, as well as other nonprofit organizations, through the provision of insured loans and loan guarantees. Until recently, the Rural Electric and Telephone Revolving Fund ("RETRF"), rather than the REA itself, advanced monies for the loans and guarantees and has borne any losses incurred under the rural electrification program.[2] The RETRF, in turn, has financed its lending from repayments of principal and interest and sales of certificates of beneficial ownership to the Federal Financing Bank ("FFB").[3]

When offered at the government's cost of borrowing, loans made by the REA subsidize rural power. The interest rate the government has to pay for money is only the return on a risk-free investment. Without federal assistance, REA borrowers would have to pay a higher rate of interest to obtain insured or guaranteed loans because of the non-zero risk involved. The difference between the government's rate of interest and the rate the borrower would have otherwise had to pay is the subsidy; the cost to the government is the risk of default. In private credit markets, interest rates and guarantee fees incorporate a risk premium.[4] This premium both induces lenders to bear the risk of default and assures that, on average, payments by borrowers are sufficient to cover default losses. In government lending, default risk exists in at least equal measure. The cost of this risk, which is borne by taxpayers without direct compensation, is the fee that would be required to induce a lender to bear these risks. Consequently, when the guarantee program of the Rural Electrifi-

---

**2.** Under the Federal Credit Reform Act of 1990, the REA Revolving Fund was phased out and replaced by a Liquidating Account covering loans made before October 1, 1991. In addition, a Financing Account was established to cover funds advanced after October 1, 1991. *See* 2 U.S.C. § 661 (Supp.1992).

**3.** Insured loans, which constitute a small percentage of REA credit activity, are made at a 5 percent interest rate. The lion's share of REA credit consists of loan guarantees, almost al-

ways made by the FFB, at an interest rate "not more than the rate of interest applicable to other similar loans then being made or purchases by the [FFB]." 7 U.S.C. §§ 935–36 (Supp. 1992). This rate is equal to the Treasury's borrowing rate plus one-eighth of a percentage point. App. Brief at 4 n. 1.

**4.** The Rural Electrification Act prohibits the REA from charging a guarantee fee. 7 U.S.C. § 936 (1980).

cation Act, 7 U.S.C. § 901 *et seq.* (1980 & Supp.1992) ("RE Act"), requires all REA borrowers to pay a rate of interest only marginally higher than the government's cost of borrowing (.125% higher), the rate paid by REA borrowers is substantially lower than on long-term borrowing by companies seeking credit in private markets.

Both of the current loan mechanisms of the REA reflect these subsidies. REA-insured loans contain a hidden interest subsidy representing the difference between the interest rate the borrower would obtain without REA assistance and the interest rate the government must pay for money. Moreover, the insured loans contain an explicit subsidy if the government is making insured loans at interest rates below its cost of borrowing. REA-guaranteed loans also provide both a subsidy to borrowers in the form of interest rate savings and a cost to the government in the form of risk.[5] When the chance of default by the firm is high, a guarantee can have substantial value on a large loan.[6]

Furthermore, all REA loans contain a more latent subsidy which is reflected in the amount of leverage that the REA allows its borrowers.[7] Loans to cooperatives represent the entire investment in their property, whereas private companies must finance a large part of their investment through more costly classes of securities rather than bonds. The more leveraged a firm is, the higher the required return on the debt will be in order to attract capital. Therefore, the more leveraged the position of a rural electric cooperative, the lower the interest rate it is charged in proportion to what the market would charge.

In an world unconstrained by the RE Act, the risk in a project of the scope of Marble Hill—in conjunction with the obvious incentives of a customer-owned borrower such as Wabash Valley to charge low rates—should lead the REA to adjust the interest rate charged, which would, in turn, increase the rates Wabash Valley would charge its customers. However, the RE Act allocates to the REA and its Administrator only limited authority for effectuating the goals of the RE Act. As a consequence, the REA is obliged to rely on its financing documents—the wholesale power contract, the loan contract, and the security instrument—to condition repayment and thereby protect itself.

## II.

As we indicated in our previous decision, customer-owned utilities can function as self-regulating entities because they have no incentive to charge excessive rates for the electricity they sell. *Wabash I,* 903 F.2d at 447. Therefore, REA-financed cooperatives do not require protection against

5. Further evidence of a policy of subsidizing rural electrification is found in the statutory provision affording the REA the discretion to lengthen the repayment period of loans and to subordinate the government's lien position in the event of default by a REA-financed cooperative. 7 U.S.C. §§ 912, 934 (1980 & Supp.1992). The existence and duration of these subsidies strongly indicate that Congress has recognized the need for the federal government to absorb some of the costs of rural electrification.

6. The present value of a loan guarantee is the amount lenders would be willing to pay today to relieve themselves of all risk of default on an otherwise equivalent unguaranteed loan. R. Brealey and S. Myers, *Principles of Corporate Finance* 567 (1988).

7. The favorable treatment accorded to power supply borrowers would appear to impede one of the basic goals of REA assistance—functioning without it. In a 1973 amendment to the RE Act, Congress urged that cooperatives "be encouraged and assisted to develop their resources and ability to achieve the financial strength needed to enable them to satisfy their credit needs from their own financial organizations and other sources at reasonable rates and terms consistent with the loan applicant's ability to pay and the achievement of the Act's objectives." 7 U.S.C. § 930. However, the very structure that Congress adopted undermines the ability of cooperatives to develop other sources of financing. The extremely high leverage of power supply cooperatives makes fixed payment debt issued by such cooperatives very risky for creditors, which would lead to unusually high interest rates on that debt. *See* J. Van Horne, *Financial Management and Policy* 506 (1989). At the same time, the nonprofit status of these cooperatives prohibits them from soliciting private equity capital in order to improve their capital structure. Moreover, the policy of keeping capital contributions by distribution cooperative members to a minimum forecloses another avenue of improving their capital structure.

their own managers' decisions. Despite the incentives provided by the structure and operation of the RE Act, however, borrowers do not have unfettered discretion. The REA itself exercises control over all of its borrowers through the imposition of contractual requirements (and not through the explicit regulation of electricity rates). In addition, eleven states also regulate prices charged by their cooperative electric utilities. In these states the REA makes its loans and guarantees with the knowledge that state regulation applies.[8]

The relationship among the power supply cooperatives, distribution cooperatives, and the REA is structured through the wholesale power contract. This contract obligates a distribution cooperative to purchase all of its electric power over a fixed term (in this instance, forty years) from a power supply cooperative. When lending money to the power supply cooperatives, the REA requires that they enter into wholesale power contracts with member distribution cooperatives. (Likewise, when entering into such relationships with distribution cooperatives, the REA requires those distribution cooperatives to enter into similar contracts with power supply cooperatives.) This arrangement ensures that power supply borrowers will be able to earn revenue from the sale of power sufficient to meet their costs. One level of protection is the security interest the REA takes in the physical assets of both types of cooperatives as well as in the respective rights and interests of each party under the wholesale power contracts.

In addition to taking a security interest in the assets of the power supply cooperative, including the wholesale power contracts, the REA requires a power supply borrower, such as Wabash Valley, to obtain the approval of state regulatory agencies for its investment projects before lending any money. Within this system of supervi-

sion, the wholesale power contracts themselves constitute the lynchpin of the REA lending program. A state regulatory agency that sets cooperative utility rates too low would frustrate the effectiveness of the wholesale power contracts. As a result, the REA contends that ratemaking by state regulatory agencies which seriously compromises the ability of REA borrowers to make required payments is subject to preemption.

## A.

When the federal government acts within its constitutional authority, it is empowered to preempt state laws to the extent it believes such action to be necessary to achieve its purposes. The Supremacy Clause of the Constitution authorizes this federal action, and the phrase "Laws of the United States" of Article IV encompasses both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization. For this reason, the Supreme Court has not only established a number of ways in which Congress can be understood to have preempted state law, *see Louisiana Public Service Comm'n v. F.C.C.*, 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898–99, 90 L.E.2d 369 (1986), but the Court has also recognized that "a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." *Id.* at 369, 106 S.Ct. at 1898–99.

In order for the REA to enforce its preemption regulations, it must overcome two significant obstacles. The first hurdle is the longstanding presumption against preemption of an area traditionally subject to state regulation. *See California v. ARC American Corp.*, 490 U.S. 93, 100, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989). When regulation is of a field traditionally occupied by the states, "we start with the assumption that the historic police powers

---

8. For example, the language of Wabash Valley's mortgage agreement repeats the more general language of standard REA mortgages, which provide that cooperative rates would be "subject to applicable laws and rules and orders of regulatory bodies." According to *Arkansas Electric*

*Cooperative Corp. v. Arkansas Public Service Comm'n*, 461 U.S. 375, 388, 103 S.Ct. 1905, 1914, 76 L.Ed.2d 1 (1983), "any reference in an REA document to a 'regulatory commission' could only mean a state regulatory agency."

of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 231, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). The same principle applies when an agency acts to preempt the field. *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 715, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985). More than fifty years of state regulation of cooperative utility rates (in those states that have continued to regulate these rates) since the enactment of the RE Act certainly reflects the fact that Congress has not occupied the field. Therefore, the REA must demonstrate a conflict between state regulation of cooperatives and the federal rural electrification program that is strong enough to overcome the presumption that state ratemaking can constitutionally coexist with the federal financing regime.

The second obstacle in the REA's path is the scope of the agency's authority in rulemaking. Legal authorization for preemptive federal regulations follows from two fundamental precepts. "First, an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it. Second, the best way of determining whether Congress intended the regulations of an administrative agency to displace state law is to examine the nature and scope of the authority granted by Congress to the agency." *Louisiana Public Service Comm'n*, 476 U.S. at 374, 106 S.Ct. at 1901. Under the very deferential standard of review enunciated by the Supreme Court, our inquiry is whether a federal agency has properly exercised its own delegated authority rather than simply whether Congress has properly exercised its legislative power. Thus, in determining when state law is preempted by federal regulation, a "narrow focus on Congress' intent to supersede state law [is] misdirected" because "[a] preemptive regulation's force does not depend on express congressional authorization to displace state law." *Fidelity Federal Savings & Loan Assn. v. De la Cuesta*, 458 U.S. 141, 154, 102 S.Ct. 3014, 3023,

73 L.Ed.2d 664 (1982). If authorized by statute, the regulations of an agency will preempt state law that conflicts with such regulations or frustrates the purpose of those regulations. *City of New York v. F.C.C.*, 486 U.S. 57, 64, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48 (1988); *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984).

## B.

Much of the discussion—and disagreement—over the REA's authority to preempt turns on the single Supreme Court decision in this area. *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Comm'n*, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983), established that, as a rule, states may regulate electricity prices charged by cooperatives that have received credit from the REA. However, the Supreme Court identified two potential exceptions:

> There may come a time when the REA changes its present policy, and announces that state rate regulation of rural power cooperatives is inconsistent with federal policy. If that were to happen, and if such a rule was valid under the Rural Electrification Act, it would of course preempt any further exercise of jurisdiction by the [state regulatory authority].... Moreover, even without an explicit statement by the REA, a particular rate set by the [state regulatory authority] may so seriously compromise important federal interests, including the ability of the [cooperative] to repay its loans, as to be implicitly preempted by the Rural Electrification Act.

*Id.* at 388–89, 103 S.Ct. at 1915. Earlier in this protracted litigation, the REA forwent the chance to press the second exception, which may have been its strongest argument. When originally proceeding in Indiana to recover its investment, the REA, for reasons that are not clear to us, did not raise the possibility of implied preemption. Having failed to raise the implied preemption argument in the administrative and judicial proceedings in Indiana, the REA was prevented by principles of preclusion

from attempting to do so in federal court. *Wabash I,* 903 F.2d at 455. When this avenue was foreclosed in the previous litigation, the REA enacted the two new regulations.[9] Although the REA does not directly attempt an implied preemption argument in this appeal, the agency relies on the relevant language in *Arkansas Electric* to reinforce its assertion of statutory authority to preempt state utility regulation. In response, Wabash Valley contends that res judicata effectively prohibits the REA from relying on implied preemption, particularly if the intent of its rulemaking is to circumvent our earlier holding.

Res judicata, and its paternal twin collateral estoppel, have been the subject of widespread discussion in numerous cases. *See, e.g., United States v. Mendoza,* 464 U.S. 154, 157–59, 104 S.Ct. 568, 571, 78 L.Ed.2d 379 (1984); *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981); *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979); *Smith v. City of Chicago,* 820 F.2d 916 (7th Cir.1987). According to the Supreme Court, res judicata prevents a party "from relitigating the same cause of action against the parties to a prior decision." *Mendoza,* 464 U.S. at 163, 104 S.Ct. at 574. More illuminating, the Fifth Circuit has elaborated that res judicata "treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same 'claim' or 'cause of action.' ... Under these rules of claim preclusion, the effect of a judgment extends to the litigation of all issues relevant to the same claim between the same parties, whether or not raised at trial." *Kaspar Wire Works, Inc. v. Leco Engineering & Machinery, Inc.,* 575 F.2d 530, 535–36 (5th Cir.1978).

■ Because this litigation originated in Indiana, its rules of preclusion determine whether res judicata bars the REA from applying its regulations to the REA. *See Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); *see generally Hart and Wechsler's The Federal Courts and the Federal System,* 1627–29 (3d ed. 1988). According to Indiana law, which we summarized in *Leal v. Krajewski,* 803 F.2d 332, 334 (7th Cir.1986), claim preclusion follows from the following four factors: (1) a judgment from a court of competent jurisdiction, (2) on the merits, (3) in a suit between the same parties, in which (4) the matter at issue was, or might have been, determined in the former suit. Rather than a claim or a cause of action, therefore, we are left to decide whether there is a coincidence in the matter at issue in this and the previous litigation.

■ Indiana's formulation for what constitutes a matter at issue is more narrow than our federal rule, under which a single cause of action consists of " 'a core of operative facts' which give rise to a remedy," *In re Matter of Energy Cooperative, Inc.,* 814 F.2d 1226, 1230–31 (7th Cir.), *cert. denied,* 484 U.S. 928, 108 S.Ct. 294, 98 L.Ed.2d 254 (1987) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 789 F.2d 589, 593 (7th Cir.1986)). For purposes of claim preclusion, "[e]very [matter] which was within the issues, and which, under the issues, might have been proved, will be presumed to have been proved and adjudicated." *Peterson v. Culver Educational Foundation,* 402 N.E.2d 448, 460 (Ind.App.1980) (quoting *Town of Flora v. Indiana Service Corporation,* 222 Ind. 253, 53 N.E.2d 161 (1944)); *see Yellow Cab Co. v. Williams,* 583 N.E.2d 774, 777–79 (Ind.App.1991); *M.R. v. Meltzer,* 487 N.E.2d 836, 841 (Ind. App.1986); *Biggs v. Marsh,* 446 N.E.2d 977, 982 (Ind.App.1983). As we recognized in *Wabash I,* the inquiry under Indiana law is essentially whether the two suits deal with a common transaction or occurrence. 903

---

9. The concurrence regards our conclusion that the REA missed its chance to press the implied preemption argument held out by the Supreme Court in *Arkansas Electric* as silence. In fact, that language suggests a possible recourse for the REA absent specific regulatory action. Once the REA enacted the preemption regulations—its explicit statement, we naturally turn to its authority to do so.

F.2d at 456. Under this conceptualization, a very expansive construction of Indiana's rule of res judicata might conceivably extend to the REA's attempt to apply the preemption regulations to Wabash Valley.

█ The procedural posture of the litigation substantially complicates this analysis. At one level, it does appear that the REA has resorted to rulemaking in order to avoid the impact of our earlier holding. The REA nevertheless maintains that its authority to expressly preempt particular state rates can be implied from the RE Act itself. Arguably, the fact that the REA has waived implied preemption with respect to Wabash Valley would militate in favor of finding that res judicata bars the application of these regulations—which are themselves derived from implied authority—to Wabash Valley. It would follow that to the extent that the REA is relying on implied preemption, our earlier decision has foreclosed any revisiting of that issue.

However, this reasoning is flawed in two important respects. First, the REA's argument is not simply one founded on the principle of implied preemption. It is asserting the implied authority to engage in preemptive rulemaking rather than the authority to impliedly preempt. In this regard, the REA asserts that its regulations are compatible with the statutory responsibilities delegated by the RE Act to the Administrator of the REA. Second, the matter at issue for purposes of Indiana law are regulations that could not have been the subject of the preceding litigation because they were not in existence. While the timing and rationale of the preemption regulations may be suspect, that alone is not sufficient to bring the use of those regulations against Wabash Valley within the principles of res judicata. Such a conclusion would be an unwarranted distortion of the posture of the litigants in *Wabash I* and the Indiana rules of preclusion.[10]

### III.

█ The fact that res judicata does not bar this suit does not relieve the REA of the need to establish the validity of the regulations themselves. According to the standard expressed in *Arkansas Electric*, state law would be expressly preempted if the REA were to change its policy and "if such a rule were valid under the Rural Electrification Act." 461 U.S. at 389, 103 S.Ct. at 1915. Prior to the enactment of these regulations, the published policy of the REA required borrowers to "submit proposed rate changes to any regulatory commissions having jurisdiction and [to] seek approval in the manner prescribed by those commissions." REA Bulletin 111–4 at 1–2 (1972) (quoted in *Arkansas Electric*, 461 U.S. at 387, 103 S.Ct. at 1914). Preemption of state regulatory jurisdiction would have been wholly inconsistent with the REA's own guidelines. The new preemption regulations—which apply not only to Wabash Valley but to all REA-financed cooperatives—manifests a change in policy. While not denying states the authority to regulate rates charged by cooperatives, the REA has attempted to carve out specific exceptions to this general rule. 7 C.F.R. §§ 1717.300–310, 1717.350–356 (1991). Our principal inquiry, therefore, is whether Congress intended for the REA to exercise such preemption power.[11]

---

10. Under the concurrence's singular notion of preclusion, the REA apparently can no longer rely on federal law to overcome Indiana's regulation of Wabash Valley's rates. This approach to claim preclusion lavishes attention on the potential outcome of the REA's actions at the expense of identifying the *claim*—in the sense of the cause of action. In defining the scope of claim preclusion (and not issue preclusion, which is irrelevant to a subsequent suit between the parties to an earlier action), our ultimate source is the Indiana courts. When other facts or conditions intervene, forming a new basis for a claim, claim preclusion does not apply. *Cf. South Bend Federation of Teachers v. National*

*Education Ass'n,* 180 Ind.App. 299, 389 N.E.2d 23, 34–35 (1979). Accordingly, the issue of resorting to implied preemption was put to rest in our previous opinion. Enforcement of the preemption regulations was not. It is axiomatic that the reach of claim preclusion extends only to those theories which could have been raised in the earlier proceeding.

11. A subsidiary consideration is whether the REA has lawfully exercised properly delegated power. Provided that statutory authorization exists, regulations adopted pursuant to notice and comment rulemaking constitutes a lawful

## A.

■ Because Congress has not occupied the field, the REA must establish some other statutory basis for the new regulations. To this end, the REA argues that the fundamental purpose underlying the RE Act is that loans be repaid. Authority for this assertion derives from the Act itself, which provides that loans "shall not be made unless the Administrator finds and certifies that in his judgment the security therefor is reasonably adequate and such loan will be repaid within the time agreed." 7 U.S.C. § 904. If the Administrator finds that the loan "will be repaid," then the loan is authorized by statute, at the statutorily-fixed interest rate. *Id.* If the loan will not be repaid, then the REA is prohibited from making the loan.

■ Standard wholesale power contracts entered into by REA borrowers and distribution cooperative customers, which determine the stream of revenues, represent the principal security for an REA loan or guarantee. A borrower's revenues from its sales of electricity will constitute adequate security to ensure repayment of a loan only if the borrower is in a position to sell a sufficiently large quantity of electricity at a sufficiently high price. The REA contends that it is implausible to construe the REA's loan documents to require borrowers to design their rate structures in a manner that generates sufficient revenues to enable loan repayment, yet at the same time to empower state regulatory agencies to disapprove rates that are necessary for a borrower to generate revenues required to meet repayment schedules. 55 Fed.Reg. 38641. If state regulatory agencies can impair repayment through the imposition of inadequate rates, the argument goes, those agencies may jeopardize the viability of the rural electrification program.

■ In order to prevent this outcome, the REA now seeks to formalize its author-

ity over utility rates of power supply cooperatives through its proposed rules for preempting, on an ad hoc basis, state regulation in general ratemaking and for bankruptcy proceedings. Subject to the parameters of the statute, the proposed rules would represent a valid exercise of express preemptive authority if they serve an important federal interest. According to the REA, the important federal interest at stake consists solely of the repayment of the federal loans. In reviewing the validity of these regulations, this court does utilize the deferential standard that the REA urges. *City of New York,* 486 U.S. at 64, 108 S.Ct. at 1642; *De la Cuesta,* 458 U.S. at 154, 102 S.Ct. at 3023. However, in applying this deferential standard, we must take account for two significant factors.

First, the statute itself is silent with respect to rulemaking by the REA. Unlike the cases on which the REA relies for the deferential standard of review, the RE Act itself does not contain any general delegations of discretionary power to the Administrator. *E.g., City of New York,* 486 U.S. at 67–68, 108 S.Ct. at 1643–44 (Commissioner may "[m]ake such rules and regulations and prescribe such restrictions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter") (quoting 47 U.S.C. § 303); *De la Cuesta,* 458 U.S. at 160, 102 S.Ct. at 3026 (Federal Home Loan Bank Board may issue regulations "to provide for the organization, incorporation, examination, operation, and regulation of [savings and loan] associations.") (quoting 12 U.S.C. § 1464(a)(1)); *see also Chrysler Corp. v. Brown,* 441 U.S. 281, 308–09, 99 S.Ct. 1705, 1721, 60 L.Ed.2d 208 (1979). To argue that Congress did not intend for states to frustrate the goals of the RE Act falls short of establishing a statutory basis for the REA's sweeping assumption of regulatory authority over ratemaking for cooperatives.[12] Any au-

exercise of that power. *Batterton v. Francis,* 432 U.S. 416, 419 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977).

**12.** The wholesale power contracts underlying the REA's argument do serve to define the relationship among the power supply cooperative,

the distribution cooperatives, and the REA; consequently, such a contract would allow the REA, for example, to enforce its rights as a third-party beneficiary of the revenue stream. *See Tri-State Generation & Trans. Ass'n v. Shoshone River Power, Inc.,* 874 F.2d 1346, 1359–60 (10th Cir.1989). However, these contracts are not so

thority exercisable by the REA is merely derivative of the Administrator's responsibilities for the operation of the loan and guarantee programs under the RE Act. *See, e.g., Public Utility Dist. No. 1 v. Big Bend Elec. Cooperative, Inc.*, 618 F.2d 601 (9th Cir.1980).

Moreover, to extract a single phrase from a comprehensive legislative scheme and christen it as the defining characteristic does not comport with the spirit of the statute or its history. *See* 7 U.S.C. §§ 902, 930. Because the opinions in *Arkansas Electric* detail the legislative history of the RE Act, we will not repeat that here. *See Arkansas Electric*, 461 U.S. at 386–88, 398–401; 103 S.Ct. at 1913–14, 1920–21. Certainly, the purpose of the RE Act cannot be reduced to a single overriding concern for the welfare of the federal Treasury. Rural electrification, whether enabling electricity purchases by distribution cooperative customers or assisting the development of generation and transmission facilities, remains the fundamental goal of the RE Act. Continued congressional willingness to subsidize rural power development confirms this conclusion. We are not persuaded that national rules for rate regulation of rural electric cooperatives, administered on an ad hoc basis, is the answer to safeguard the viability of the rural electrification program itself or to protect the Treasury from defaulting borrowers. *Cf. United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 729, 99 S.Ct. 1448, 1459, 59 L.Ed.2d 711 (1979).

█ Second, the presumption against preemption reinforces our conclusion that nondiscriminatory state regulation which fosters legitimate state interests should not be subject to preemption in the manner that the REA now proposes. In denying the rate hike to Wabash Valley early in this litigation, the Indiana authorities acted in accordance with longstanding principles of utility rate regulation. We do not find that the federal interest in recovering its monies is sufficiently strong to upset the tradition of shared state and federal responsibility over the utility rates of REA-financed cooperatives. Although preemption regulations may be an adequate regulatory response to similar circumstances in the future, Congress has not embraced the regulatory approach in the original statute or its amendments. *Cf. Securities Industry Ass'n v. Board of Governors of Federal Reserve System*, 468 U.S. 137, 153–54, 104 S.Ct. 2979, 2988, 82 L.Ed.2d 107 (1984). This fact, as well as sustained congressional subsidization of rural electrification, indicate that the REA would need to show state action that is more drastic or even discriminatory before federal preemption is warranted. Allowing the Administrator to vitiate particular state rates set according to long-established principles of ratemaking is not compatible with this statutory scheme.

Being a lending agency administering a federal credit program rather than a regulatory agency, the REA has at its disposal means to secure repayment that are less disruptive to the recognized prerogative of states to regulate cooperative utility rates. *See* 55 Fed.Reg. 38641. Because interest rates on RE Act insured and guaranteed loans are fixed by statute, 7 U.S.C. §§ 935–36, the REA—unlike an ordinary commercial lender—does not have the option of making a loan at an enhanced interest rate to compensate for the perceived risk of default. Instead, the REA has the stick of its authority to lend or not to lend in a particular jurisdiction to protect against defaulting debtors. In fact, the RE Act appears to reflect an assumption by Congress when it created the Rural Electrification Administration that the REA could protect itself by setting conditions on the extension of credit.

Under the RE Act, the REA finances power-supply borrowers only with the required approvals of all state regulatory authorities. 7 U.S.C. § 904; 55 Fed.Reg. at 38654. Accordingly, if a state, in its discretion, declines to approve a proposed loan, then the RE Act does not permit the loan to be made. On the other hand, if the state gives its approval, then the loan is authorized subject to the "terms and condi-

strong as to bear the weight of a system of utility regulation that the REA proposes.

tions" imposed by the Administrator. 7 U.S.C. § 904. As a term or condition, the REA may refuse to make loans unless state regulatory authorities formally commit to rates high enough to allow repayment. The REA may similarly refuse to approve a loan unless the customers, whose promise to buy power are the real security for the debt, guarantee the loan or authorize the REA to oversee rates. If either the state or the cooperative customer balks, the REA may deploy its funds elsewhere.[13] Thus, the REA conditions power supply loans on state commitments to set wholesale power rates high enough to enable loan repayment. The REA failed to so qualify its loan guarantees to Wabash Valley.

### B.

Distilled to its essence, the REA would have Wabash Valley's subscribers absorb the losses stemming from Wabash Valley's default and the REA's mishandling of its security arrangement. While the monies disbursed through the REA are properly regarded as credit rather than grants, the tools in the REA's kit to ensure repayment are not without limits. As with any other lender, the REA assumes the business risk of advancing money to a specific organization, the risk that the organization will not be able to repay. Given the history and function of the RE Act, the scope of this risk incorporates the possibility that state regulation may occasionally impede the ability of power supply cooperatives to repay their loans. One could reasonably argue that the structure and operation of the subsidies provided through the REA reflect a congressional preference for the government's bearing this risk, rather than cooperative members. In any event, it is clear that the REA may not dictate who shall bear the risk because that would amount to the agency conferring power on itself. *Cf. Louisiana Public Service Comm'n*, 476 U.S. at 374, 106 S.Ct. at 1902. The REA has not identified a source of authority in

either the express language or the purpose and operation of the RE Act to justify its preemption regulations. Accordingly, we cannot infer that the statute grants the Administrator the authority he seeks.

For the foregoing reasons, the decision of the district court is AFFIRMED.

SHADUR, Senior District Judge, concurring in the result.

Judge Flaum's opinion provides an admirably clear exposition of an extremely complex subject matter, especially overlaid as that subject matter is in this case by a tortuous history of repeated litigation. And the result—REA's inability to enforce its 1990 preemption regulation against Wabash Valley—is equally unexceptionable. Where I must regretfully part company with the majority is in its having gone beyond that issue to one that I believe to be unnecessary to the decision: the validity or invalidity of the preemption regulation on its face (that is, whether the regulation is potentially viable against REA borrowers other than Wabash Valley under circumstances other than the unique set of facts in this case).

Not only is that added reach of the opinion unnecessary to the resolution of the two-party controversy before us, but it also seems to me that:

1. Invalidation of the regulation on its face, rather than simply as sought to be applied against Wabash Valley, is at odds with the sound jurisprudential approach counseled by Justice Brandeis in his famous concurrence in another power case—*Ashwander v. TVA*, 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936). Even though *Ashwander* dealt with the wisdom of avoiding constitutional questions as to Congress' legislative power unless those questions had to be reached to decide the particular case, I believe that the same notion of judicial restraint should extend to our not deciding on the general power of an adminis-

---

**13.** The strength of this stick should not be underestimated. After the financial difficulties with Wabash Valley, the REA suspended its lending in Indiana. Subsequently, the Indiana legislature amended its "used or useful" standard to accommodate specifically the repayment of obligations to the REA. *See* Ind.Code Ann. § 8–1–17–20 (West Supp.1992).

trative agency to "legislate," where resolving that question is equally nonessential to the current decision.

2. Invalidation of the regulation also gives insufficient credence to one of the prospects for implied preemption specifically held out by the Supreme Court in *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 389, 103 S.Ct. 1905, 1915, 76 L.Ed.2d 1 (1983). To be sure, that statement is dictum. But just as district judges are expected to pay heed to dicta from their Courts of Appeals—at least in situations where there is no need to evaluate the force (or lack of force) of such dicta in order to decide the specific case at issue—so the basic concept of our judicial hierarchy calls for Courts of Appeals to approach Supreme Court dicta in the same gingerly fashion.

Although no extended discussion is required to explain those points of departure from the majority opinion, a brief explanation is certainly in order.

First, REA must lose this case under established principles of claim preclusion. My principal reason for generally preferring the terms "claim preclusion" and "issue preclusion" over the more traditional "res judicata" and "collateral estoppel" terminology is to avoid any confusion that might stem from the fact that "res judicata" is often used as the generic term for *both* branches of preclusion stemming from prior litigation (see Justice Blackmun's opinion for the Court in *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56 (1984)). In this instance, though, the contrasting "claim preclusion" versus "issue preclusion" usage also serves to highlight the reason that Wabash Valley should prevail here on the former ground.

REA's *claim* before us is the same claim that it eschewed asserting against Wabash Valley in the original Indiana litigation between them, and that we therefore barred it from advancing on claim preclusion grounds in *Wabash I*, 903 F.2d at 455: the claim that federal law preempts the Indiana regulation because it has set too

low a rate. In *Wabash I* we scotched REA's attempted use of an agency letter as the means by which it sought to preempt state law. Even though REA now seeks to place that old wine into the new bottle of a regulation, its legal *claim* of implied preemption is no different than before. REA is no more entitled to litigate that claim, having forgone the opportunity to do so in the prior litigation between the same parties, than any losing plaintiff in any other lawsuit is free to assert the same claim a second time around by developing another legal theory for holding the defendant liable.

Thus the majority opinion's parsing of REA's current argument as one "asserting the implied authority to engage in preemptive rulemaking rather than the authority to impliedly preempt" (at 1488) gives REA more than its due. That type of distinction is one without a difference for claim preclusion purposes—it is fundamental to claim preclusion, in contrast to issue preclusion, that the former bars not only every issue that *was* urged by the losing party but also every issue that *could have been* urged in support of its position (*Leal v. Krajewski*, 803 F.2d 332, 334–35 (7th Cir.1986) (applying Indiana law)). Indeed, the majority's stated distinction could readily be paraphrased to give every disgruntled litigant a second bite at the apple in another lawsuit, by the mere device of its dreaming up a fresh theory that it did not tender to the court the first time around.

Hence REA must lose on its implied preemption claim as against Wabash Valley, because it has already had its day in court and it then chose not to argue that *claim* (as we held in *Wabash I*, 903 F.2d at 455). And that leads to my second point of departure from the majority opinion, which—despite its having quoted *Arkansas Electric* and that opinion's *two* potential bases for preemption (at 1486)—then avoids any discussion of the second of those bases for the entire balance of the text (at 1488–91) that follows the res judicata discussion.

To repeat, here is the second prospect held out in *Arkansas Electric*, 461 U.S. at 389, 103 S.Ct. at 1915:

> Moreover, even without an explicit statement by the REA, a particular rate set by the [state regulatory authority] may so seriously compromise important federal interests, including the ability of the [cooperative] to repay its loans, as to be implicitly preempted by the Rural Electrification Act.

We cannot fairly gloss over such a statement by the Supreme Court by being silent about it. That language unquestionably holds out the possibility of implied preemption of state rates *without* any need to identify a specific source in the Rural Electrification Act (unlike *Arkansas Electric*'s first potential exception, which occupies the entire substantive discussion at pages 1488–91 of the majority opinion here).

To be sure, the just-quoted statement from the ultimate judicial source (though concededly via dictum) leaves all of its readers—courts, administrative agencies, lawyers—with the task of divination, a process that has occupied lesser mortals at least since the Delphic Oracle began to issue its pronouncements. And REA has now engaged in that process: It reads that language as permitting it to issue a regulation to announce the rule that it would contemplate applying in future situations where state regulatory authority has "seriously compromise[d] important federal interests, including the ability of the [cooperative] to repay its loans."

It appears from footnote 10 to the majority opinion that I may not have made the difficulty that I find with the approach taken there entirely clear. At the risk of repetition, let me summarize briefly. REA itself has not pointed to any express authority in the Rural Electrification Act for promulgation of its preemption regulation, and Judge Flaum has painstakingly and persuasively demonstrated that no such express statutory authority exists. Hence I believe that REA must seek to prevail here—if it can—only on the ground that implied preemption is available on the basis that I have just set out: that the regulation

does no more than to announce the prospect of the kind of preemption held out as a possibility by the *Arkansas Electric* statement that I have quoted. And *that* argument was indeed available to REA, but was not made by it, in the earlier litigation. That was therefore a matter that *could have been* urged and determined in the first litigation—and, as already stated, that is the test for claim preclusion in Indiana (as everywhere).

In that view, it does not serve any useful purpose (and indeed I would suggest that it undercuts sound jurisprudential principles) for this Court to decide two issues that it need not resolve in order to rule against REA in light of the litigation history here:

1. whether the prospect of implied preemption is indeed held out as a possibility by what the Supreme Court said in *Arkansas Electric*, and

2. whether a regulation—essentially an agency's advance announcement of the existence of such a possibility and of the general principles that will govern its exercise—is an appropriate way to apprise the legal community of REA's position in those respects.

If both of those questions merit an affirmative answer, then the regulation is valid despite its lack of grounding in express statutory authorization. But those questions are better left for decision by a court in the future if, at some later date, REA were to apply that new regulation to a concrete case involving an inadequate rate approved by a state agency in the face of the preemption regulation (a *very* different situation from the one that we confront here).

Accordingly, although I agree entirely with the emptiness of REA's position in this case because it has forfeited its right to argue implied preemption against Wabash Valley, I regret that I cannot subscribe to a decision that forecloses REA from taking the Supreme Court at its word in dealing in the future with others who are not parties to this litigation, in circumstances where REA has not tied its own hands as it has against Wabash · Valley. For the reasons stated here, I concur in the

result reached by the majority but not in its rationale for arriving at that result.