49 F.3d 1074
 CITY OF MORGAN CITY, Plaintiff-Intervenor-Defendant-Appellant,
v.
SOUTH LOUISIANA ELECTRIC COOPERATIVE ASSOCIATION,
Defendant-Intervenor-Appellee, Third
Party-Plaintiff-Appellee,
and
Cajun Electric Power Cooperative Inc., Intervenor-Plaintiff-Appellee,
and
United States of America, thru Rural Electrification
Administration (REA), Third Party-Defendant-Appellee.
 No. 93-4295.
 United States Court of Appeals,
Fifth Circuit.
 April 3, 1995.
 
 Dale Hughes Hayes, Leonard & Hayes, Morgan City, LA, Wallace E. Brand, Brand, Beeny, Berger & Whitler, Washington, DC, T.H. Freeland, T.H. Freeland, IV, Freeland & Freeland, Oxford, MS, for Morgan City.
 James M. Funderburk, Duval, Funderburk, Sundbery & Lovell, Houma, LA, for South Louisiana Elec. Co-op. Ass'n.
 William E. Hodgkins, John Schwab, Schwab & Walter, Baton Rouge, LA, for Cajun Elec. Power Co-op., Inc.
 Thomas M. Bondy, Mark B. Stern, Civ. Div., Appellate Staff, John Christopher Kohn, U.S. Dept. of Justice, Washington, DC, for U.S.
 Clifton S. Elgarten, Amy J. Mauser, Crowell & Moring, Washington, DC, for amicus American Public Power Ass'n, Nat. Institute of Mun. Law Offices & Nat. League of Cities.
 Wallace F. Tillman, Jonathan Hemenway Glazier, Nat. Rural Elec. Co-op. Ass'n, Washington, DC, for amicus Nat. Rural Elec. Co-op. Ass'n.
 N. Beth Emery, Sutherland, Askill & Brennan, Washington, DC, for amicus Nat. Rural Elec.
 Appeal from the United States District Court for the Western District of Louisiana.
 ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN
 BANC
 (Opinion September 12, 1994, 5th Cir.1994, 31 F.3d 319)
 Before POLITZ, Chief Judge, DAVIS and WIENER, Circuit Judges.
 PER CURIAM:
 
 
 1
 We deny Morgan City's petition for rehearing in this case.[1] We take this opportunity, however, to address a number of Morgan City's arguments.
 
 
 2
 Morgan City first argues that we have created a far-reaching "per se" rule of preemption that is inconsistent with the Supreme Court's decision in Arkansas Electric Coop. Corp. v. Arkansas Public Service Commission, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983). The Arkansas Electric case is distinguishable. In that decision, a rural electric cooperative mounted a facial challenge to a state's right to regulate a rural cooperative's wholesale electric rates. The Court held that the Rural Electrification Act ("REAct"), 7 U.S.C. Sec. 901 et seq., does not preempt a state's "mere assertion of jurisdiction" to regulate a cooperative's rates. Id. at 389, 103 S.Ct. at 1915.
 
 
 3
 In the present case, SLECA does not assert a facial challenge to a state's power to regulate or expropriate a rural cooperative's service area and equipment. Rather, SLECA challenges actual expropriations of its specific property and service rights. Morgan City's characterization of our decision as creating a "per se" rule of preemption is therefore mistaken. The panel's preemption analysis focussed on the actual effect of these specific expropriations, not whether the REAct facially preempts all attempts by states to expropriate the property of a rural cooperative. Significantly, Arkansas Electric confirms that concrete action taken by a state "may so seriously compromise important federal interests, including the ability of the [coop] to repay its loans, as to be implicitly preempted by the Rural Electrification Act." 461 U.S. at 389, 103 S.Ct. at 1915 (emphasis added). Morgan City's argument is thus unavailing.
 
 
 4
 Morgan City argues next that the language of the REAct does not create a federal purpose which could be frustrated if the threatened condemnation were allowed to proceed. We disagree. The language of 7 U.S.C. Sec. 907 reflects Congress' concern that piecemeal disposition of a cooperative's property and service rights might impair the Rural Electrification Administration's ("REA") security interest in the cooperative's assets. Section 907 prohibits a cooperative or other entity that borrows funds from the REA from "sell[ing] or dispose[ing] of its property, rights, or franchises" without the agency's prior approval. In the panel opinion, we declined to decide whether Sec. 907 should be interpreted broadly enough to allow the REA to prevent a proposed expropriation.[2] However, at the very least, the provision reflects a general federal policy of protecting the integrity of the REA's security interests. Thus, even a narrow interpretation of Sec. 907 supports the panel's preemption analysis.
 
 
 5
 Finally, we reject Morgan City's contention that the record does not support the panel's conclusions. SLECA's summary judgment evidence includes a copy of a comprehensive twenty-eight page report on the effect of proposed expropriations prepared by the REA, the agency charged with administering the REAct. The report considered not only the number of SLECA's customers affected by the expropriations, but also the extent to which these customers accounted for a large percentage of SLECA's revenues because of the density of the service area involved. The report concludes that the planned condemnations would reduce SLECA's gross revenues by $768,000 annually and decrease its system operating margins by 88.26%. In assessing the effect of the condemnations, the REA also considered future planned expropriations by Morgan City (the Phase III Plan) and the nearby City of Houma.
 
 
 6
 Morgan City's summary judgment affidavits fail to effectively rebut the REA report's detailed findings. Morgan City's primary contention is that the panel should not have considered the proposed future expropriations in assessing the impact on SLECA. However, these proposed condemnations were not merely hypothetical threats. SLECA points to testimony by Morgan City's mayor that Phase III was fully planned and ready for implementation. The REA report also points to statements by Houma city officials revealing that the city planned to expropriate SLECA's adjoining service area. These planned future expropriations were thus highly relevant to assessing the overall impact of the expropriations on SLECA. If courts are not allowed to consider fully planned future expropriations under these circumstances, states and municipalities could escape preemption by merely dividing planned expropriations into incremental phases that, when considered individually, are insufficient to invoke preemption.
 
 
 7
 For these reasons, Morgan City's petition for panel rehearing is DENIED.
 
 
 8
 A member of the court in active service having requested a poll on the reconsideration of this cause en banc, and a majority of the judges in active service not having voted in favor, rehearing en banc is DENIED.
 
 
 9
 EDITH H. JONES, Circuit Judge, with whom, JERRY E. SMITH and DeMOSS, Circuit Judges, join, dissents from the Denial of Rehearing En Banc:
 
 
 10
 The panel opinion and opinion on rehearing in this case have, under the rubric of "frustration preemption,"[1] approved a breathtaking federal power-grab by REA from local government units that otherwise enjoy broad eminent domain authority. Neither the REA nor its regulations contemplate preemption of this quintessential local power--the agency's regulations in fact assume the opposite.[2] That REA lacks broad preemptive authority was emphasized by the Supreme Court's rebuff of agency efforts to thwart local electrical rate regulation. Arkansas Electric Cooperative v. Arkansas Public Service Commission, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1982). Surely, if state rate regulation is permitted, though it contains the power to hobble a federally financed cooperative,[3] then the eminent domain power--exercisable only on payment of just compensation--has not been overridden by statute or, even more vaguely, by a conclusional judicial stamp labelled "frustration of purpose." Because the panel opinion has given REA authority that Congress clearly denied it and that the Supreme Court, I am confident, has also withheld, I respectfully dissent from the denial of en banc rehearing.
 
 
 11
 By relying on the notion of frustration preemption, the original panel opinion held that Morgan City's attempted annexation of customers from SLECA, an REA-financed rural electrical cooperative, must fail because it might impair SLECA's ability to repay REA's loans. Curiously, that opinion never cited Arkansas Electric, the critical Supreme Court decision concerning preemption of local regulatory authority under the Rural Electrification Act. Only in its rehearing opinion does the panel attempt to grapple with the implications of Arkansas Electric. To me, that case is fatal to the panel's decision.
 
 
 12
 In Arkansas Electric, the Supreme Court rejected an implied preemption argument nearly identical to that advanced here. REA argued that local rate regulation may "frustrate important federal interests":
 
 
 13
 [I]n passing on rate questions, the REA considers, not only the security thus afforded for payment of the loan, but also the suitability of the rates and structure to the Act's underlying purpose of facilitating the availability of cheap electric power in rural America.
 
 
 14
 . . . . .
 
 
 15
 The spectre of state regulation poses a threat to the REA loan because of the possibility that the state may refuse to permit its cooperatives to pay a generation and transmission association the rates to which they agreed and upon the security of which the loan was issued. Moreover, the policy behind the Rural Electrification Act is at stake ... [T]he REA has always encouraged its borrowers to establish affordable rates for all of its subscribers. In this way, costs are shared in a manner which, over the long run, benefits all by the creation of a sound, extensive rural electric system.
 
 
 16
 Arkansas Electric, 461 U.S. at 385-86, 103 S.Ct. at 1913 (omissions in original).
 
 
 17
 To REA's policy arguments, the Court responded, first, that, "[A]lthough the REA was expected to play a role in assisting the fledgling rural power cooperatives in setting their rate structures, it would do so within the constraints of existing state regulatory schemes." Arkansas Electric, 461 U.S. at 386, 103 S.Ct. at 1913 (citing legislative history of 1936 Act) (emphasis added). Second, the Court noted that REA's presently published policy was inconsistent with preemption of state regulatory jurisdiction. Id. at 387-88, 103 S.Ct. at 1914. Third, responding to the possibility that state regulation of rates could jeopardize "the Government's interest in securing its loans," the Court observed: "The relevant inquiry, however, is not whether Congress authorized or expected such regulation, but whether it intended by its own actions to forbid it." Id. at 387 n. 11, 103 S.Ct. at 1914 n. 11 (emphasis in original).[4]
 
 
 18
 The premises of decision in Arkansas Electric govern the case before us. Just as the Supreme Court held that the structure of the REA implies coexistence of the agency's program with local electrical rate regulation, that same structure commands coexistence with local eminent domain authority.[5] As in Arkansas Electric, no statutory provision precludes the exercise of the local expropriation power. The panel's attempt to resurrect, in the opinion on rehearing, 7 U.S.C. Sec. 907 as a source of implied preemptive authority is simply incorrect.[6] That provision permits REA, like any lender, to prevent voluntary alienation of its collateral by the borrower; it says noting about REA's ability to forestall involuntary condemnation of service territory. Under Arkansas Electric, local governmental units plainly retain their right to condemn REA-backed cooperatives' assets.
 
 
 19
 In their rehearing opinion, the panel has belatedly placed a fig leaf over its conflict with Arkansas Electric, distinguishing that case as a facial challenge to local regulation, while Morgan City's case involves an alleged actual conflict wrought by specific expropriations of SLECA's customers. As the panel observes, Arkansas Electric did not entirely foreclose the possibility that a particular rate may so seriously compromise federal interests, including the ability to repay loans, as to be impliedly preempted. Id. 461 U.S. at 389, 103 S.Ct. at 1915. For several reasons, this argument is unpersuasive. First, whether there is an actual conflict that "frustrates the ability to repay REA-backed loans" raises a factual question. Yet no hearing or trial occurred here, despite conflicting affidavits of competent experts on both sides.[7] Second, the trial court did not view this as a factual but as a purely legal dispute. See City of Morgan City v. South Louisiana Electric, 837 F.Supp. 194, 199 (W.D.La.1993) (review of REA's withholding approval decision under Sec. 907 limited to "arbitrary and capricious, in light of the record as a matter of law"). Third, REA's and SLECA's fears of conflict between federal and local authority are utterly hypothetical, because they predict dire domino-like consequences of future expropriations if even one be allowed to occur, and because they essentially assume that in no expropriation will local regulations adequately reimburse SLECA with just compensation. Fourth, and most tellingly, if the condemnation of 252 customers, a mere one percent of those served by SLECA, "frustrates" a federal purpose, then what exercise of eminent domain would not do so? The practical effect of the panel's decision is much broader than its self-deprecating language would suggest. Because the panel has not based its decision on a factual finding of "frustration" so much as upon a rubber-stamp of an agency conclusion,[8] the real frustration here is of the Arkansas Electric holding.
 
 
 20
 What particularly troubles me about this case is the panel's willingness to allow a federal lending agency to get more than its due at the expense of local sovereignty. REA claims the authority to override municipal condemnation authority because otherwise, it asserts, SLECA's operating costs may rise and may necessitate higher rates to customers and jeopardize SLECA's ability to repay its federal loans. The Seventh Circuit pointedly answered such arguments: "To the extent the REA believes that states must adopt rules of the law that always allow federal lenders to recoup their investments, it is mistaken." Wabash Valley Power Ass'n v. REA, 903 F.2d 445, 454 (7th Cir.1990) (citing United States v. Kimbell Foods, Inc., 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979)). Further, "Congress' assumption when it created the Rural Electrification Act in 1936 seems to have been that the REA could protect itself [from this parade of horribles] by setting conditions on the extension of credit." Wabash Valley Power Ass'n, 903 F.2d at 453 (holding that direct, invasive regulation of state utility rates was not preempted).[9]
 
 
 21
 Even the core of the panel's opinion--preemption premised in frustration of a federal purpose--is highly problematic, rarely utilized by the Supreme Court and of dubious propriety.[10] As Judges Higginbotham, Seymour, Sneed, and then-Judge Starr, Justices William C. Clark and John Criswell have observed, "obstacle preemption demands a high degree of judicial policymaking." The LAW OF PREEMPTION, a Report of the Appellate Judges Conference American Bar Association at 38 (1991).
 
 
 22
 The effect of this decision must be to embolden federal lending agencies to overcome costly or inconvenient local regulations by advancing newly-minted frustration of purpose arguments in federal court. Such an extension of this type of implied preemption doctrine is an unwholesome development because it takes power away from
 
 
 23
 --Congress, which carefully described the agency's authority;
 
 
 24
 --the administrative rule-making process, which could preempt local regulation after allowing all affected parties to participate; and
 
 
 25
 --local, politically responsible authorities.
 
 The panel decision transfers power to
 
 26
 --REA officials, without benefit of express statutory authority or regulation;
 
 
 27
 --federally financed rural electrical coops, who must be surprised at this development;[11] and
 
 
 28
 --federal judges, who have the final, delphic say in what constitutes a "frustration of purpose."
 
 
 29
 "Frustration of purpose" preemption should not be allowed drastically to expand a federal lending agency's authority where Congress expressly contemplated it would play by local regulatory rules.
 
 
 30
 I respectfully dissent.
 
 
 
 [1]
 City of Morgan City v. South Louisiana Elec. Coop. Ass'n, 31 F.3d 319 (5th Cir.1994)
 
 
 [2]
 The Ninth Circuit has suggested in two decisions that Sec. 907 might authorize the REA to block a proposed expropriation. In both decisions, however, the court ultimately based its holding on the fact that the proposed condemnation frustrated a federal purpose. See Public Utility District No. 1 of Franklin County v. Big Bend Elec. Coop., Inc., 618 F.2d 601, 603 (9th Cir.1980); Public Utility District No. 1 of Pend Oreille County v. United States, 417 F.2d 200, 200-02 (9th Cir.1969)
 
 
 [1]
 "Frustration preemption" is employed as a short-hand reference for the proposition that state law is (impliedly) preempted when, though it does not conflict with a federal statute, it would unduly frustrate the purposes of such a statute by "discouraging conduct that federal legislation specifically seeks to encourage." Morgan City, 31 F.3d at 322
 
 
 [2]
 See 7 C.F.R. Sec. 1710.12(b)(5) (Administrator to account for risks "of loss of portions of borrower's service territory from annexation" in assessing likelihood that loan will be repaid.)
 
 
 [3]
 Cajun Electric Power Co., an REA-financed supplier of electricity to SLECA and participant in this case, recently entered bankruptcy proceedings in part because of niggardly local rate regulation
 
 
 [4]
 See also Commonwealth Edison v. Montana, 453 U.S. 609, 633-34, 101 S.Ct. 2946, 2961-62, 69 L.Ed.2d 884 (1981) (rejecting that general statements of national policy can demonstrate congressional intent to pre-empt state legislation that may have an adverse impact on attainment of that policy objective). "[P]re-emption of state law by federal statute or regulation is not favored in the absence of persuasive reasons--either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." Id. at 634, 101 S.Ct. at 2962 (citations omitted). "In cases such as this, it is necessary to look beyond general expressions of 'national policy' to specific federal statutes with which the state law is claimed to conflict." Id. Nor is this requirement limited to facial challenges. Id. at 633, 101 S.Ct. at 2961-62. The appellants in Commonwealth Edison "insist[ed] that they [we]re entitled to a hearing ... to adduce evidence supporting their claim that the "state action" frustrates and impairs" the national policy of encouraging the use of coal." Id
 
 
 [5]
 Compare City of Madison v. Bear Creek Water Ass'n., 816 F.2d 1057 (5th Cir.1987) (federal statute unambiguously barred annexation or condemnation.)
 
 
 [6]
 Although the district court relied on Sec. 907, the original panel opinion pointedly declined to do so. 31 F.3d 319
 
 
 [7]
 Letters by the administrator of the REA cannot suffice to ordain preemption. Wabash Valley Power Association v. REA, 903 F.2d 445, 453 (7th Cir.1990). ("In order to preempt state authority, the REA must establish rules for the force of law."); Thomas v. New York, 802 F.2d 1443 (D.C.Cir.1986) (Scalia, J.) (holding that a letter from the Administrator of the EPA does not have force of law). "We have not found any case holding that a federal agency may preempt state law without either rulemaking or adjudication." Id
 
 
 [8]
 Interestingly, the Court itself sounded warning about the need to discount the REA's preferences: "All this is not to say that officials of the REA have always welcomed state regulation of rural power cooperatives, or thought it was a good idea. But, of course, such expressions of opinion do not constitute sufficient grounds for pre-emption." Arkansas Electric, 461 U.S. at 386 n. 10, 103 S.Ct. at 1913 n. 10 (citation omitted)
 
 
 [9]
 Judge Easterbrook also noted the economic windfall reaped by the REA by virtue of its preemption argument:
 [T]he REA made its loans and guarantees on the assumption that state regulation would apply....
 [This] may have led to an adjustment in the interest rate, which, in turn increases the rates [the utility] charges. (If there was no adjustment, people at the REA were asleep on the job.) When the risk materialized, the REA has demanded shelter of federal law plus the interest rate that reflected the interest risk created by state law. Nice cushion, if you can get it.
 Wabash Valley, 903 F.2d at 455.
 
 
 [10]
 See also Stephen A. Gardbaum, The Nature of Preemption, 79 Cornell L.Rev. 767 (1994), who argues that the vitality of this strain of preemption hinges on confusing the Supremacy Clause and preemption. On the one hand, the supremacy of federal law means that valid federal law overrides otherwise valid state law in cases of conflict between the two. Hence supremacy does not deprive the state of any of its preexisting concurrent lawmaking authority, but merely dictates that a particular state law in conflict with a particular federal law will be trumped in cases where both apply. Preemption, by contrast, means (a) that states are deprived of their power to act at all in a given area, and (b) that this is so whether or not state law is in conflict with federal law
 
 
 [11]
 In an amicus brief filed with this case in October, 1993, the National Rural Electrical Cooperative Association attached a "Final Report of the Territorial Integrity Committee," which explains and complains about how many municipal annexations of members' property were occurring in the late 1980's