**State of TENNESSEE ex rel. CITY OF COOKVILLE, TENNESSEE,
Plaintiff,**

v.

**UPPER CUMBERLAND ELECTRIC MEMBERSHIP CORPORATION, Hilda G. Legg, Administrator, Rural Utilities Service, an agency of the U.S. Department of Agriculture, Sheldon C. Petersen, Governor & CEO, National Bank of Cooperatives, National Rural Utilities Cooperative Finance Corporation, Defendants.**

No. 2:02–0093.

United States District Court,
M.D. Tennessee,
Nashville Division.

March 26, 2003.

John H. Sinclair, Jr., Office of the Attorney General and Reporter, Frank Stovall King, Jr., King & Ballow, Nashville, Thomas Michael O'Mara, Cookeville, for Tennessee State of, on the relation of, City of Cookeville, Tennessee, pltfs.

J. Richard Lodge, W. Brantley Phillips, Jr., Russell S. Baldwin, Bass, Berry & Sims, Nashville, Jacky Orange Bellar, Bellar & Bellar, Carthage, Michael L. Roden, Office of the United States Attorney, Nashville, Frances M. Toole, Department of Justice, Georgann Gutteridge, U.S. Department of Agriculture General Counsel/Rural Utilities Division, Washington, DC, Paul C. Ney, Jr., Trauger, Ney & Tuke, Nashville, for Upper Cumberland Electric Membership Corporation, Hilda G. Legg, Rural Utilities Services, an agency of the, Agriculture, Department of, Sheldon C. Peterson, Governor & CEO of National Bank for Cooperatives, National Bank for Cooperatives, National Rural Utilities Cooperative Finance Corporation, defts.

### MEMORANDUM

WISEMAN, Senior District Judge.

On July 31, 2001, the City of Cookeville Department of Electricity ("Cookeville" or "Plaintiff") filed a Complaint in the Circuit Court for Putnam County, Tennessee, seeking to condemn Upper Cumberland Electric Membership Corporation's ("UCEMC") facilities and service rights within five areas recently annexed by Cookeville. In order to comply with Tenn. Code Ann. § 29–16–106, which requires that all parties having any interest in the land or rights involved in an eminent domain case be made defendants, Cookeville added as defendants the federal Rural Utilities Service ("RUS"),[1] an agency of the United States Department of Agriculture, and the National Rural Utilities Cooperative Finance Corporation ("CFC"). UCEMC has about $33.96 million in outstanding long-term debt, all of which is secured by mortgages held by RUS and CFC on all of UCEMC's property, including the property at issue in this case. On November 20, 2002, RUS removed this matter to federal district court pursuant to 28 U.S.C. § 1442(a)(1). RUS has not consented to the proposed condemnation. Currently before the Court are two motions by Cookeville, one to remand the case to state court and the other for summary judgment. For the reasons set forth below, the Court DENIES both motions.

### I. Motion to Remand

#### A. Cookeville's Motion

Cookeville filed a Motion to Remand the Case for Lack of Subject Matter Jurisdiction on December 5, 2002. Cookeville claims that the United States, on behalf of RUS, lacks subject matter jurisdiction to prosecute this matter in this Court. In its affirmative defense to the Complaint, RUS claims this Court has subject matter jurisdiction because Cookeville's reliance on Tennessee state law may be preempted if Cookeville's actions are determined to frustrate the purpose of a RUS program

---

**1.** The Rural Electrification Act of 1936 created the Rural Electrification Administration to oversee loans to promote rural electrification. The Department of Agriculture Reorganization Act of 1994 created the Rural Utilities Service with jurisdiction over rural electric, telephone, waste, and water programs formerly under separate administrations, such as the Rural Electrification Administration. *See* 7 U.S.C. § 6942. Thus, even though some documents filed by Cookeville and cases cited by both parties refer to the Rural Electrification Administration, the Court will refer to the Rural Utilities Service.

defined by federal law. Cookeville claims that this affirmative defense lacks specificity and does not justify district court jurisdiction, because RUS does not allege or demonstrate how it will financially or otherwise suffer if this eminent domain case is remanded. The 1993 Restated Mortgage and Security Agreement ("1993 Agreement"), drafted by RUS, refers to the use of proceeds if the mortgaged property is taken under the power of eminent domain: "In the event the Mortgaged property [sic], or any part thereof, shall be taken under the power of eminent domain, all proceeds and avails therefrom, except to the extent that both of the Mortgagees shall consent to other use and application thereof by the Mortgagor, shall forthwith be applied by the Mortgagor."

### B. UCEMC's Response

■ Defendant UCEMC, in its Response, notes that Cookeville seems to base its Motion to Remand entirely on the assertion that RUS's Answer did not plead a federal defense with sufficient specificity. Section 1442(a)(1), however, authorizes the United States or any federal agency to remove a state court action against it to federal court as long as it was acting under color of office, and unlike the general removal statute, does not require that the action could have been originally filed in federal court. *See Williams v. Brooks,* 945 F.2d 1322, 1324 n. 2 (5th Cir.1991). In order to give the district court jurisdiction, the federal agency need only raise a federal defense in its answer to the state action. *See Mesa v. California,* 489 U.S. 121, 136,

109 S.Ct. 959, 103 L.Ed.2d 99 (1989). RUS, in its Answer, stated as an affirmative defense that federal law may preempt the state law on which Cookeville relies, a federal question sufficient to confer federal subject matter jurisdiction. Since federal rules require only notice pleading, this Answer was sufficient notice to Cookeville of the defense under federal law. Whether federal law in fact preempts state law in this instance requires further discovery, and the ultimate success of the affirmative defense is not a prerequisite to this Court exercising jurisdiction. *See* James Wm. Moore, et al., *Moore's Federal Practice* § 107.15[1][b][iv][A] (3d ed.2000) (citing *Jefferson County v. Acker,* 527 U.S. 423, 431, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999)).

### C. Cookeville's Supplement

Plaintiff Cookeville filed a "Supplement to Motion to Remand This Case for Lack of Subject Matter Jurisdiction," in which it argues that new information has come to its attention since filing the original Motion for Remand.[2] Cookeville learned that there was a 1996 Restated Mortgage and Security Agreement ("1996 Agreement") which restates the mortgagor's (UCEMC) right to sell the mortgagees' (RUS and CFC) security without the mortgagees' prior written approval. Section 3.11 of this 1996 Agreement states:

The Mortgagor may not ... without the prior written approval of each Mortgagee, sell, lease or transfer any Mortgaged Property to any other person or entity

---

**2.** Additionally, Cookeville filed a "Response to Upper Cumberland Electric Membership Corporation's Opposition to Plaintiff's Motion to Remand the United States' Removal Under 28 U.S.C. § 1442(a)(1)" in which it refers to and restates its arguments in the Supplement to its Motion to Remand. Under Fed.R.Civ.P. 15(d), Cookeville should have requested permission to supplement its Motion to Remand,

but because the parties do not dispute that the supplement actually refers to the correct contract in force on the date the Complaint was filed, this fault is immaterial. UCEMC has filed a Response to Cookeville's Supplement, adopting and incorporating by reference its Response to Cookeville's original Motion to Remand.

(including any subsidiary or affiliate of the Mortgagor), unless

   (1) there exists no Event of Default or occurrence which with the passing of time and the giving of notice would be an Event of Default,

   (2) fair market value is obtained for such property,

   (3) the aggregate value of assets so sold, leased or transferred in any 12–month period is less than 10% of Net Utility Plant, and

   (4) the proceeds of such sale, lease or transfer, less ordinary and reasonable expenses incident to such transaction, are immediately

      (i) applied as a prepayment of all Notes equally and ratably,

      (ii) in the case of dispositions of equipment, materials or scrap, applied to the purchase of other property useful in the Mortgagor's utility business, not necessarily of the same kind as property dispose [sic] of, which shall forthwith become subject to the Lien of the Mortgage, or

      (iii) applied to the acquisition or construction of utility plant.

As an Exhibit, Cookeville attaches UCEMC's entry in the 2000 Membership Directory of the Tennessee Valley Public Power Association, where UCEMC's total system assets for 2000 are listed as $87,506,520. As a second Exhibit, Cookeville attaches the affidavit of Joseph A. Peek, Manager of the Cookeville Department of Electricity. This affidavit was subsequently superseded by a Corrected Declaration of Joseph A. Peek, filed on February 7, 2003. Mr. Peek values the fair market value of UCEMC's electric distribution properties and service rights within the five annexed areas on the effective annexation dates in 2000 as $2,284,139.73. According to Cookeville, this amount equals 3.19% of UCEMC's net

utility plant, which it is allowed to sell in a twelve-month period without the mortgagees' written consent. The Supreme Court of Tennessee has previously upheld the fairness and equity of using the formula set forth in Tenn.Code Ann. § 6–51–112(a)(2) (formerly, § 6–320(2)). *See Duck River Elec. Membership Corp. v. City of Manchester*, 529 S.W.2d 202, 208 (Tenn. 1975). Thus, Cookeville argues, because the RUS has authorized UCEMC to dispose of less than 10% of net utility plant in any twelve-month period without consent, the RUS has no preemptive rights to interfere with the sale and no authority to remove the case. Cookeville contends that it has not sued the United States or any agency "in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for... the collection of the revenue." 28 U.S.C. § 1442(a)(1). Because the RUS will not be "frustrated" unless UCEMC sells more than 10% of RUS security, Cookeville concludes, RUS's affirmative defense does not raise a colorable claim of a federal defense.

### D. RUS's Response

After receiving two extensions of time in which to respond, the RUS filed a Response to Cookeville's Motion to Remand on March 7, 2003. The RUS argues, as UCEMC does, that possible federal preemption is clearly a federal question justifying removal, and that RUS's pleadings were sufficient to provide notice to Cookeville of this federal question. In response to Cookeville's argument that the 1996 Agreement allows transfers of less than 10% of net utility plant without prior written approval, the RUS asserts that Cookeville misreads the mortgage agreement. First, the RUS emphasizes that the Court must look at all four requirements, not just the 10% of net utility one. *See supra.* Cookeville has not addressed the remain-

ing three requirements at all. One of the requirements is that "fair market value is obtained for such property." According to the RUS, whether Tennessee state condemnation law provides fair market value, as construed under federal law, is one of the preemption issues that may come up in this case. In other words, Tennessee law might state that its condemnation laws provide fair payments, but whether those payments are sufficient so as not to frustrate the federal purpose behind the REA is a federal question. Second, the RUS argues that Cookeville has not even proven the 10% of net utility plant requirement, because it refers to assets sold in any 12–month period, not just the one condemnation at issue here.

### E. Cookeville's Reply

Cookeville filed a Response to RUS's objection to its Motion to Remand on March 13, 2003. Cookeville argues that 28 U.S.C. § 1442(a)(1) does not give the Court jurisdiction because the suit is not one against any "person" for the collection of revenue. Cookeville then cites extensively to *City of Stilwell v. Ozarks Rural Elec. Coop. Corp., et al.,* 79 F.3d 1038 (10th Cir.1996). This case is discussed at length in the discussion of Cookeville's Motion for Summary Judgment, *infra,* and goes more to the merits of this suit and not whether or not the Court has jurisdiction.

### F. Analysis

▪ The current version of § 1442(a)(1) provides for removal of any action commenced against "[t]he United States or any agency thereof, or any officer (or any person under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office...." 28 U.S.C. § 1142(a)(1) (2003). Clearly, the RUS is an agency of the United States being sued for acting under color of its office in this case. UCEMC and RUS are correct that a federal defense was adequately pled under the notice pleading requirements. The Defendants need not prove that federal law will in fact preempt state law, just that this question will be an issue the Court will need to decide. Cookeville has not adequately proven that the 1996 Agreement supersedes any federal preemption issues, so this Court has jurisdiction to hear the case. The Court DENIES the Motion to Remand, because the RUS adequately pled a federal defense, and this case will likely turn on questions involving a federal statute.

## II. Motion for Summary Judgment

### A. Cookeville's Motion

Cookeville seeks summary judgment on Count Five of its Complaint, involving the Shipley Road annexation area.[3] In its Motion for Summary Judgment, Cookeville simply lays out all of the facts as it sees them: (1) Cookeville is a municipality with the power to operate public utilities, (2) Tenn.Code Ann. § 7–52–103(a) authorizes municipalities to acquire and operate an electric plant to provide electric services to consumers, (3) Tenn.Code Ann. § 6–51–102 authorizes Cookeville to annex the

---

**3.** The title of Cookeville's motion for summary judgment states that it is only a motion against Defendant UCEMC. All of the Defendants, however, are interrelated, and a judgment against UCEMC on any claim in effect would be a judgment against the other Defendants. Furthermore, Defendant CFC has replied to the motion for summary judgment, indicating its understanding that a ruling on the motion would apply to all Defendants. Defendant RUS, while never actually responding, did file a motion for extension of time to respond, indicating a similar understanding of the scope of the motion. Thus, the Court will treat the motion as one for summary judgment on count five as to all Defendants.

property at issue, (4) pursuant to Tenn. Code Ann. § 6–51–112, Cookeville offered to purchase the property and UCEMC was obligated to sell it, (5) a fair price under the statute of $5,342.93 cash plus annual installments of $1,901.62 was determined for the property, (6) UCEMC has continually refused to comply with this offer to purchase and consummate the sale as required by Tennessee law, and (7) thus, Cookeville is entitled to a judgment conveying UCEMC's electric distribution properties and rights in the annexed area upon Cookeville's payment of those sums. After UCEMC refused to sell, Cookeville filed this eminent domain action. The Tennessee Supreme Court has held that "a municipality has the exclusive power to control the distribution of electricity within its boundaries." *Duck River Elec. Membership Corp. v. City of Manchester,* 529 S.W.2d 202, 206–07 (Tenn.1975); *see City of South Fulton, et al. v. Hickman–Fulton Counties Rural Elect. Coop. Corp., et al.,* 976 S.W.2d 86, 89 (Tenn.1998).

### B. UCEMC's Response

UCEMC filed a Brief in Opposition to Plaintiff's Motion for Summary Judgment, correctly referring to the motion as actually one for partial summary judgment since it involves only one of five claims in this case.[4] UCEMC argues extensively that Cookeville is attempting to condemn in piecemeal fashion all of UCEMC's facilities and service rights in the area around Cookeville as part of a growth plan for the city. According to UCEMC, this is one of its most profitable areas and its loss would substantially hurt the revenues earned by UCEMC, and consequently its ability to pay back its mortgagees, RUS and CMC. Furthermore, such losses will ultimately be bourne by UCEMC's remaining cus-tomers in the form of higher charges for electricity, and would thus severely impair UCEMC's ability to provide reliable, low-cost service to its remaining customers. As to the actual legal dispute, UCEMC argues that the proposed taking by Cookeville would frustrate the purposes of the Rural Electrification Act of 1936 ("REA"), 7 U.S.C. § § 901 *et seq.,* and that such a transfer cannot take place without the consent of RUS under 7 U.S.C. § 907. Any conflict between these federal statutes and Tennessee law cited by Cookeville, UCEMC argues, must be resolved in favor of federal law pursuant to the Supremacy Clause, U.S. Const. art. VI, cl. 2.

First, UCEMC argues that the REA requires consent of the RUS before a borrower may sell or dispose of property or rights in which RUS holds a security interest, including involuntary disposition by condemnation. 7 U.S.C. § 907; *see City of Morgan City v. South La. Elec. Coop. Assoc.,* 837 F.Supp. 194, 196 (W.D.La. 1993), *aff'd,* 31 F.3d 319 (5th Cir.1994), *reh'g denied,* 49 F.3d 1074 (5th Cir.), *cert. denied,* 516 U.S. 908, 116 S.Ct. 275, 133 L.Ed.2d 196 (1995). UCEMC admits that Tennessee law authorizes municipalities to condemn electric distribution properties and service rights located within their municipal boundaries without regard to RUS consent. Tenn.Code Ann. § 6–51–112; *Duck River Elec. Membership Corp. v. City of Manchester,* 529 S.W.2d 202, 205–07 (Tenn.1975). Thus, state and federal law directly conflict, and under the Supremacy Clause the federal provision must control.

Second, UCEMC argues that there remains a question of material fact as to whether Cookeville's proposed condemna-

---

4. In a separate Response to Plaintiff's Motion for Summary Judgment on Count Five, Defendant CFC adopted and incorporated by reference UCEMC's Response. Despite an extension of time, the RUS never filed a response, so the Court will assume it also adopts UCEMC's Response.

tions would frustrate the purposes of the REA, and thus should be preempted by it. The REA was enacted to ensure reliable and affordable electric service to rural America. *See City of Morgan City v. South La. Elect. Coop. Assoc.*, 31 F.3d 319, 322–23 (5th Cir.1994), *reh'g denied*, 49 F.3d 1074, *cert. denied*, 516 U.S. 908, 116 S.Ct. 275, 133 L.Ed.2d 196 (1995); *Tri–State Generation & Transmission Ass'n v. Shoshone River Power Inc.*, 874 F.2d 1346, 1348 (10th Cir.1989). The proposed condemnation of a portion of federally subsidized rural electrification, even if compensated under state law, could impair this objective by weakening the remainder of the system and lessening its ability to function effectively. *See Morgan City,* 31 F.3d at 323 (citing *Public Utility Dist. No. 1 of Pend Oreille County v. United States,* 417 F.2d 200 (9th Cir.1969)). Economies of scale could be lost, resulting in higher rates to the remaining users and difficulties repaying federally secured debts, especially because municipalities would be annexing the parts of the system with the highest population density. *See City of Madison, Mississippi v. Bear Creek Water Assoc., Inc.,* 816 F.2d 1057, 1060 (5th Cir. 1987). After the annexation, the remaining portions of the system must continue to operate with decent service and at decent rates. *See Public Utility Dist. No. 1 of Pend Oreille County v. United States,* 417 F.2d 200, 201 (9th Cir.1969). In determining a utility's ability to continue providing reliable and efficient service, at least one court has not limited itself to the proposed condemnation in that case only, but looked to future annexations proposed by the city as part of a plan of annexations. *City of Morgan City,* 31 F.3d at 324. Otherwise, cities could accomplish by piecemeal what they could not accomplish

all at once. *City of Morgan City v. South La. Elect. Coop. Assoc.,* 49 F.3d 1074, 1076 (5th Cir.1995) (denial of rehearing).

In this case, UCEMC emphasizes that Cookeville seeks to annex five tracts of service territory and has annexed four other tracts since filing this case. Cookeville admits that these annexations are part of its "Comprehensive Land Use Plan," providing for growth of the city pursuant to Tenn.Code. Ann. §§ 6–58–101 *et seq.* UCEMC asserts that the five tracts at issue in this suit encompass 520 UCEMC members and account for approximately $740,000 in annual revenue, with the four additional tracts encompassing 590 UCEMC members and accounting for approximately $1.15 million in revenues.[5] At this time, UCEMC estimates that under Tenn.Code Ann. § 6–51–112, if Cookeville condemns the nine tracts, it will owe UCEMC approximately $540,000 per year for 10 years—about 29% of the annual revenue UCEMC would otherwise receive from this property. UCEMC claims this decrease in revenue will frustrate its ability to meet its current long-term debt and operational commitments, especially because after ten years all payments will stop, yet most of UCEMC's debt does not mature until after 2018. Furthermore, under its Two–Year Work Plan developed pursuant to RUS requirements, UCEMC plans improvements to its electric distribution system which will require it to take on an additional $15 million in long-term debt financed through RUS and/or CFC and secured by a mortgage on UCEMC's plant and equipment. Yet Cookeville's growth plan intends ultimately to annex even more sections of UCEMC's most profitable service area. The net effect of these annexations, according to UCEMC, is to dramat-

---

5. For most of the figures and calculations pertaining to revenues, UCEMC relies on the affidavit of its General Manager, Carl V. Brandt, a copy of which has been filed with the Court.

ically reduce UCEMC's current service area and density of its remaining service area, dramatically reduce UCEMC's revenues (a loss of approximately 4000 members and $3 million in annual revenues), cause severe financial consequences for UCEMC, and as a result greatly undermine its ability to meet its long-term debts without substantial rate increases. Such increases, UCEMC contends, would frustrate the policy behind the REA, so state law is preempted.[6] *See City of Morgan City v. South La. Elec. Coop. Assoc.*, 31 F.3d 319 (5th Cir.1994), *reh'g denied*, 49 F.3d 1074, *cert. denied*, 516 U.S. 908, 116 S.Ct. 275, 133 L.Ed.2d 196 (1995); *Pend Oreille*, 417 F.2d at 201 (9th Cir.1969). UCEMC concludes by stating what it believes is the genuine issue of material fact remaining that makes summary judgment inappropriate: whether Cookeville's proposed condemnations " 'stand as an obstacle' to the repayment of federal loans, to the financial viability of [the] federally financed electricity cooperative[ ], and ultimately, to the maintenance of electricity service to rural areas." *City of Morgan City*, 31 F.3d at 324. As far as state law would allow such a result, UCEMC maintains, it is preempted by federal law in the form of the REA.

## C. Analysis

### (1) Case Law

■ Congress may preempt state authority, within Constitutional limits, by so stating in express terms. *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Development Commission, et al.*, 461 U.S. 190, 203, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). Absent explicit language, Congress' intent to supersede state law may be found in two ways. *Id.* at 204, 103 S.Ct. 1713. First, Congress may "oc-

cupy the field" by enacting legislation so pervasive and dominant that the federal system will be presumed to preclude enforcement of state laws on the same subject. *Id.* (citing *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 151, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982)). Second, "[e]ven where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law … when 'compliance with both federal and state regulations is a physical impossibility' … or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Id.* (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). It is this final version of preemption—frustration of Congressional purpose—on which UCEMC relies.

The resolution of conflicts between the REA and state condemnation law is a fairly unresolved area of the law. The first case dealing with the issue was from the Ninth Circuit, *Public Utility District No. 1 of Pend Oreille Cty. v. United States*, 417 F.2d 200 (9th Cir.1969). In *Pend Oreille*, the county, pursuant to state law, sought to acquire the facilities of a private nonprofit membership corporation furnishing electricity in the county. *Id.* at 200. The corporation was financed through the REA and had mortgaged all of its assets to RUS. *Id.* The Ninth Circuit held that the state law under which the county sought to condemn the facilities could not stand because it did not take into account the degree to which it interfered with the fed-

---

**6.** UCEMC makes clear in its brief that it does not oppose Cookeville's growth plan as long as UCEMC is allowed to keep all of its current Putnam County facilities and service rights and maintain its territorial integrity and long-term viability.

eral purpose behind the REA. *Id.* at 202. The court noted the Congressionally-determined national interest in extending electricity to the farms of America, and the means of achieving this by offering low interest loans for rural electrification. *Id.* at 201; *see Wabash Valley Power Assoc. v. REA,* 988 F.2d 1480, 1489–90 (7th Cir. 1993) (stating, as support for invalidating RUS regulations that attempted to control rates charged by a bankrupt cooperative, that the federal interest behind the REA is not solely the repayment of loans, but the goal of rural electrification). Then the court stated: "True, the United States, when the loan is paid, no longer has the same direct interest in the borrowing distributor, but so long as the United States is interested in keeping the electric lamps lit on the farms, it is of necessity interested in the vehicles distributing the electricity which will light those lamps." *Pend Oreille,* 417 F.2d at 201. The court distinguished normal condemnation cases where whatever is sought simply can be paid for, because "what is sought to be taken here is part of a system and even if the part taken is paid for, and if an award is made for the damage to the remaining portion, a question remains as to the capacity of the remaining portions of the system to function." *Id.* Finally, the Ninth Circuit specifically limited its holding: "We infer nothing as to the rule to be applied in a case where under governing state law it could be made to appear as a matter of fact that the taking for state purposes would not interfere with the federal purpose." *Id.* at 203.

The Ninth Circuit affirmed this rule in *Public Utility District No. 1 of Franklin Cty. v. Big Bend Elec. Coop., Inc.,* 618 F.2d 601 (9th Cir.1980). Although the county disputed RUS' determination that the condemnation would interfere with the purposes behind the REA, the court announced a policy of deference to the federal agency's determination in its area of

expertise "unless it is arbitrary, capricious, or an abuse of discretion." *Id.* at 603. In the alternative, the court also suggested that under 7 U.S.C. § 907, the cooperative could not dispose of the property, even involuntarily, without RUS approval. *Id.* at 602.

A district court in Louisiana followed the Ninth Circuit's reasoning in *City of Morgan City v. South Louisiana Elec. Coop. Assoc., et al.,* 837 F.Supp. 194, 195 (W.D.La.1993). The court stated the issue as follows: the RUS's "approval authority" under § 907 as to a condemnation by a state or city of electric facilities which are indebted to the REA. *Id.* The court cited *Pend Oreille* and *Big Bend* in holding that the RUS has the authority to approve or disapprove of any disposition of such property, even involuntary condemnation. *Id.* at 196. The court reasoned that Congress gave the RUS "the right to protect a declared national interest in electrifying rural America and a small measure of safety for ensuring continued existence of the 'reasonably adequate' security upon which it bases its decision to make a long term loan." *Id.* at 198. Thus, under § 907, approval of the RUS is a prerequisite to any proposed expropriation, "contrary state law notwithstanding." *Id.* Since the RUS had made a determination that the City of Morgan City's proposed condemnation would decrease the ability of the RUS to serve its purpose, the court granted the cooperative's and RUS's motion to dismiss. The court also cited extensively to an analogous Fifth Circuit opinion, *City of Madison v. Bear Creek Water Assoc., Inc., et al.,* 816 F.2d 1057 (1987). *Bear Creek* involved an eminent domain proceeding to condemn water facilities of an association indebted to the Farmers Home Administration ("FmHA"), under a statute with some language differing from that of the REA. *Id.* at 1059; 7 U.S.C. § 1926(b). For example, 7 U.S.C. § 1926(b) provides

that water services provided to rural areas through an association receiving federal loans under the act "shall not be curtailed or limited by the inclusion of the area served by such association within the boundaries of any municipal corporation or other public body...." There is no comparable language in the REA. Nevertheless, as with the REA, the purpose behind the statute was to provide water to rural areas and to provide financial security to associations providing such services. *Bear Creek,* 816 F.2d at 1060. The *Bear Creek* court stated:

> The case at bar exemplifies the evil Congress wished to avoid.... Even if fair value is paid for the lost facilities, such an action would inevitably have an adverse effect on the remaining customers of Bear Creek, in the form of lost economies of scale and resulting higher peruser costs. To allow expanding municipalities to "skim the cream" by annexing and condemning those parts of a water association with the highest population density (and thus the lowest per-user cost) would undermine Congress's purpose of facilitating inexpensive water supplies for farmers and other rural residents and protecting those associations' ability to repay their FmHA debts.

*Id.* at 1060 (citing *Public Utility Dist. No. 1 of Franklin Cty. v. Big Bend Elec. Coop., Inc.,* 618 F.2d 601 (9th Cir.1980)). Congress' intent with regard to the REA to avoid "skimming the cream" is not as clear, given the lack of a section comparable to that in 7 U.S.C. § 1926(b). *See infra.*

On appeal, the Fifth Circuit affirmed on alternative grounds: that the state law condemnation would frustrate the federal purpose behind the REA. *City of Morgan City v. South Louisiana Elec. Coop. Assoc., et al.,* 31 F.3d 319, 320 (5th Cir.1994). The Fifth Circuit specifically "saved for another day" the issue of whether § 907 confers authority on the RUS to withhold

approval of an involuntary disposition. *Id.* at 322. The court noted that, in 1936, the purpose behind the REA was to ensure that electric service be provided to rural America by offering low interest insured loans and loan guarantees to cooperatives serving rural areas. *Id.* Louisiana, much like Tennessee, had a statute allowing any municipality to expropriate property whenever necessary for the public interest as determined by the municipality. The court, citing *Pend Oreille* and *Bear Creek,* held that the expropriation "would 'stand as an obstacle' to the repayment of federal loans, to the financial viability of federally financed electricity cooperatives, and ultimately, to the maintenance of electricity service to rural areas." *Id.* at 324. Morgan City had argued that the number of consumers was too small to have any such effect, but the court found that 252 users in a densely populated area would be significant to the cooperative. *Id.* The court held: "Permitting Morgan City to condemn these 252 users would pave the way for piecemeal erosion of other high-density service areas adjacent to Morgan City and other cities." *Id.*

The United States Supreme Court arguably altered the tone of the debate in 1983 with its decision in *Arkansas Elec. Coop. Corp. v. Arkansas Public Serv. Commission,* 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983). The Court was faced with a challenge by an electric cooperative that received funding through the REA to the jurisdiction of the Arkansas Public Service Commission [Arkansas PSC] to control its rates. *Id.* at 377. The plaintiff cooperative in this case did not actually provide power directly to rural individuals, but sold it to its member cooperatives who then distributed the power. *Id.* The Court first noted that, if the cooperative were not under the supervision of the RUS, then the rates it charged would be subject exclusively to federal regulation under the Fed-

eral Power Act. *Id.* at 381, 103 S.Ct. 1905. The Arkansas PSC asserted jurisdiction over the rates charged by the member cooperatives based on state statutes. *Id.* at 382, 103 S.Ct. 1905. The cooperative asserted that state regulation of the rates was preempted by the REA. *Id.* The Arkansas Supreme Court upheld the Arkansas PSC's jurisdiction over rates, and the United States Supreme Court affirmed. *Id.* The Court initially held: "Nothing in the Rural Electrification Act expressly pre-empts state rate regulation of power cooperatives financed by the [RUS]." *Id.* at 385, 103 S.Ct. 1905. As to the argument that the state's involvement would frustrate the important federal interest behind the REA, the Court responded that "the legislative history of the Rural Electrification Act makes abundantly clear that, although the [RUS] was expected to play a role in assisting the fledgling rural power cooperatives in setting their rate structures, it would do so within the constraints of existing state regulatory schemes." *Id.* at 386, 103 S.Ct. 1905. The Court continued:

> There may come a time when the [RUS] changes its present policy, and announces that state rate regulation of rural power cooperatives is inconsistent with federal policy. If that were to happen, and if such a rule was valid under the Rural Electrification Act, it would of course pre-empt any further exercise of jurisdiction by the Arkansas PSC.... the PSC can make no regulation affecting rural power cooperatives which conflicts with particular regulations promulgated by the [RUS]. Moreover, even without an explicit statement from the [RUS], a particular rate set by the Arkansas PSC may so seriously compromise important federal interests, including the ability of [the cooperative] to repay its loans, as to be implicitly pre-empted by the Rural Electrification Act. We will not, however, in this facial chal-

lenge to the PSC's mere assertion of jurisdiction, assume that such a hypothetical event is so likely to occur as to preclude the setting of any rates at all. *Id.* at 388–89, 103 S.Ct. 1905 (internal citations omitted). Thus, *Arkansas Electric* involved a different set of facts—setting rates instead of condemning facilities—and was decided on a facial challenge to the state agency's jurisdiction. Nevertheless, the Court's reading of the REA is instructive. First, it is clear from the legislative history that the federal statute is meant to work within existing state regulatory frameworks. Second, it is clear that any action by a state that did in fact "seriously compromise important federal interests" might be pre-empted by the REA.

In a published denial of a petition for rehearing, the Fifth Circuit reaffirmed its holding in *Morgan City* and distinguished *Arkansas Electric* because it involved a facial challenge to the state's power to regulate a rural cooperative's wholesale electric rates. *City of Morgan City v. South Louisiana Elec. Coop. Assoc., et al.,* 49 F.3d 1074, 1075 (5th Cir.1995). In other words, the Fifth Circuit announced that *Arkansas Electric* did not change its stance. *But see City of Morgan City v. South Louisiana Elec. Coop. Assoc., et al.,* 49 F.3d 1074, 1076 (5th Cir.1995) (Jones, J., dissenting) ("The panel opinion and opinion on rehearing in this case have, under the rubric of 'frustration preemption,' approved a breathtaking federal powergrab by REA from local government units that otherwise enjoy broad eminent domain authority."). The Supreme Court denied *certiorari. City of Morgan City v. South Louisiana Elec. Coop. Assoc., et al.,* 516 U.S. 908, 116 S.Ct. 275, 133 L.Ed.2d 196 (1995). The Fifth Circuit has, however, held that the RUS does not have preemptive authority to regulate the rates charged by a utility in default of its loans from RUS. *See In re Cajun Elec. Power*

*Coop. Inc.*, 109 F.3d 248, 257 (5th Cir. 1997).

The Tenth Circuit, on the other hand, held that the Ninth and Fifth Circuit views were in error after *Arkansas Electric. See City of Stilwell v. Ozarks Rural Elec. Coop. Corp., et al.*, 79 F.3d 1038 (10th Cir.1996). The court was faced with a situation much like the one in the present case, and in *Morgan City* and *Pend Oreille*, in which the city under state law sought to condemn electric facilities and service rights of an electric cooperative receiving funding under the REA. *Id.* at 1040. Relying on *Morgan City* and *Pend Oreille*, the district court held that the proposed condemnation would frustrate the purpose of the REA and granted summary judgment for the cooperative. *Id.* at 1041. The Tenth Circuit reversed. *Id.* The court emphasized that the Supreme Court in *Arkansas Electric* specifically stated that the REA was supposed to assist rural cooperatives within the existing state regulatory schemes, and that there was no express language preempting state statutory schemes allowing condemnation by cities. *Id.* at 1044. The court reasoned that regulation of utilities is one of the most important functions traditionally associated with the police power of the state, and the primary purpose of the REA is simply to electrify rural America at affordable rates. *Id.* The court refused to adopt the cooperative's argument that this purpose also encompassed "assurances that what is left after a proposed condemnation will be able to efficiently and economically continue its mission of providing reliable, low priced electric service in rural America." *Id.* (quoting the defendant's brief at 14). The Tenth Circuit instead asserted that, once an area is included within a municipality, it is no longer "rural" and clearly falls outside the ambit of the REA. *Id.* According to the court, the Supreme Court in *Arkansas Electric* endorsed exactly the type of federal/state interrelation

exhibited in Oklahoma. *Id.* The REA was not meant to regulate the operation of rural electric cooperatives, "it merely assists their operation by offering low interest financing." *Id.* at 1045. The state, by contrast, establishes the framework under which the REA works, and part of that framework is to place a limit on a rural cooperative's powers to extend beyond rural areas and into cities. *Id.* This limitation, the court held, did not "frustrate the purpose" of the REA at all. *Id.*

The *City of Stilwell* court also specifically rejected the cooperative's "skimming the cream" argument by distinguishing Morgan City, Bear Creek, and *Pend Oreille*. *Id.* Initially, the court pointed out that *Bear Creek* involved a different federal statute and was not applicable. *Id.* As for *Morgan City* and *Pend Oreille*, the court emphasized that in both of those cases the RUS had come forward to oppose the proposed condemnation and asserted that it would result in substantial harm to the federal rural electrification program. *Id.* In *City of Stilwell*, the RUS did not oppose the condemnation and specifically described the impact of the proposed condemnation as "minimal." *Id.* Citing *Arkansas Electric*, the court also rejected the "skimming the cream" argument because it relied on an interpretation of the REA as contemplating a system where rural customers are subsidized by relying on revenues generated from urban customers. *Id.* at 1046. The Tenth Circuit could not find any such express or implied intent in the REA; rather, the intent was to subsidize rural cooperatives by offering low-interest financing, not by making available to them more lucrative markets for electric power. *Id.* (citing *Wabash Valley Power Ass'n v. REA*, 988 F.2d 1480, 1483–84 (7th Cir.1993) (invalidating RUS regulations attempting to control rates for a bankrupt cooperative in order to ensure that its loans were re-

paid)). Congress could have chosen to have urban electricity consumers subsidize its aims of rural electrification, and thus eliminate the need to offer low-interest loans to cooperatives, but it did not, and "[i]t is not the province of the courts to design new methods of financing rural electrification that Congress never contemplated." *Id.*

More recently, the Supreme Court of Alaska has considered each of the different views and adopted the *City of Stilwell* holding. *Tlingit–Haida Regional Electrical Authority v. Alaska, et al.,* 15 P.3d 754 (Alaska 2001). The court held that a public utility commission, which had granted rights to serve a city to two different utilities, one of which had received loans under the REA, was not preempted by the REA because the utility could still repay its loans. *Id.* at 768. The court initially noted that the RUS is more of a lending agency than a classic public utility regulatory body, whose central purpose is to lend money to promote rural electrification. *Id.* at 767 (citing *Arkansas Electric,* 461 U.S. at 386, 103 S.Ct. 1905). The court stated that, because the REA was designed to promote rural electrification, direct interference with property mortgaged to the RUS "could conceivably frustrate the purposes of the Act." *Id.* Such is not the case, however, if the state regulation is legitimate and allows the utility to recoup its investments. *Id.* The court specifically referred to *City of Stilwell* as the "better view" than *Morgan City. Id.* at 767 & n. 44. The cooperative attempted to distin-guish *City of Stilwell* because in *Tlingit–Haida,* an RUS officer testified that losing the disputed service area would doom the utility and its ability to repay the loans. *Id.* at 768. The court, however, refused to rely on such a personal prediction, but instead deferred to the state commission's determination that the utility would be capable of surviving the loss of the contested service area. *Id.*[7]

## (2) Application

There are good policy arguments on both sides of this debate. Defendants argue in favor of the overarching policy of rural electrification and the broad needs of farming communities. Cookeville, on the other hand, argues for deference to states in their traditional arena of utilities, and in favor of allowing cities to grow with their needs. The Ninth and Fifth Circuits have adopted views favorable to the Defendants, while the Tenth Circuit has sided with Cookeville's arguments. The Sixth Circuit has yet to address the matter. After *Arkansas Electric,* the Tenth Circuit's arguments are quite persuasive, based on the fact that the REA was meant only to lend money to support ruralization of electricity. *See City of Stilwell v. Ozarks Rural Elec. Coop. Corp., et al.,* 79 F.3d 1038, 1045 (10th Cir.1996). The REA does specifically say it will work within the constraints of existing state regulatory schemes, and logically once a municipality condemns property under state law then it is no longer "rural" and covered by the REA. *Id.* at 1044. Similarly, the conclusions of the

7. There has also been academic support for the proposition that the REA was never intended to preempt state condemnation law in the manner permitted in *Morgan City. See* Joel A. Youngblood, "Alive and Well; The Rural Electrification Act Preempts State Condemnation Law: *City of Morgan City v. South Louisiana Electric Cooperative Ass'n,*" 16 Energy L.J. 489 (1995). The author states: "The Fifth Circuit Court of Appeals, in a direct affront to legislative intent, has created a far-reaching and dangerous precedent favoring unwarranted interference with the most fundamental of states' rights." *Id.* at 490. Youngblood also fears that, without authority to annex and condemn outlying areas, cities will be limited in their ability to promote growth and economic development. *Id.* at 508.

*City of Stilwell* court against the "skimming the cream" argument are particularly persuasive—Congress could have adopted legislation aiding rural electricity by forcing urbanites to subsidize it, but instead opted for low-interest loans. *Id.* at 1045.

In *City of Stilwell,* however, the RUS did not oppose the condemnation and came forward to argue that it would not frustrate the purposes of the REA. *Id.* This fact by itself distinguishes that case from the one at bar. *But see Tlingit–Haida Regional Electrical Authority v. Alaska, et al.,* 15 P.3d 754, 768 (Alaska 2001) (following *City of Stilwell* despite the fact that an RUS officer testified against the condemnation). In the present case, the RUS has not actually filed a Response to Cookeville's Motion to Dismiss or otherwise taken a stance on the issue of frustration of the REA.[8] The key point at this time is that the RUS has not come out to say that it does *not* oppose the condemnation, as it did in City of Stilwell, UCEMC and CFC, on the other hand, have argued that the condemnation would frustrate the purposes of the REA. The Court is left with conflicting arguments, each of which offers compelling factual and legal analyses, and no firm position taken by the relevant federal agency.[9]

■ Ultimately, this case will come down to just that factual question: whether *this* annexation will frustrate the purposes of the REA. Because this is a factual question to which the Court needs more

discovery and proof, Cookeville's Motion for Summary Judgment is DENIED.

### III. Conclusion

For the foregoing reasons, the Court DENIES both Cookeville's Motion for Remand and Cookeville's Motion for Summary Judgment.

It is so ORDERED.

### ORDER

Before the Court are two motions filed by Plaintiff State of Tennessee ex rel. City of Cookeville, Tennessee ("Plaintiff"). The first is Plaintiff's Motion to Remand the Case for Lack of Subject Matter Jurisdiction (Doc. No. 14), asking the Court to remand the case to the state court from which it was removed by Defendant Rural Utilities Service. The second is Plaintiff's Motion for Summary Judgment Against Upper Cumberland Electric Membership Corporation on Plaintiff's Count Five (Doc. No. 29). For the reasons set forth in the accompanying memorandum, both of Plaintiff's motions are DENIED.

It is so ORDERED.

---

8. Failure to file a response is usually viewed as non-opposition to the motion. Given the tenor of the RUS's Response to the Motion to Remand, however, it appears likely that the RUS will argue that this condemnation would indeed frustrate the purposes of the REA. As noted earlier, UCEMC has filed a lengthy response taking this position on which the other Defendants could rely. In any event, it is not necessary for the Court to speculate as to the RUS' position at this time.

9. The Ninth and Fifth Circuits correctly give deference to the RUS's determination in this area of their expertise. *See Public Utility District No. 1 of Franklin Cty. v. Big Bend Elec. Coop., Inc.,* 618 F.2d 601, 603 (9th Cir. 1980). *But see Tlingit–Haida,* 15 P.3d at 768 (deferring to the state commission's view that the utility would survive the condemnation over the testimony of an RUS officer that it would not).